## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

A.B., an individual;

<div style="margin-left:2em">Plaintiff</div>

-against-

MARRIOTT INTERNATIONAL, INC.;

<div style="margin-left:2em">Defendant.</div>

CIVIL ACTION NO :

**PLAINTIFF'S COMPLAINT FOR DAMAGES AND JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW the Plaintiff A.B., by and through her undersigned counsel, and respectfully submits her complaint for damages against Defendant, and makes the following averments.

## INTRODUCTION

1.  For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country.  Criminals parade their misconduct openly at hotels throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2.  Marriott International, Inc. knew and has known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country.  Rather than taking timely and effective measures to thwart this epidemic, Defendant has instead chosen to ignore the open and obvious presence of sex trafficking at its hotels, enjoying the profit from rooms rented for this explicit and apparent purpose.

3.  This action for damages is brought by the Plaintiff, a survivor of sex trafficking (hereinafter identified by her initials "A.B."), under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA") and Pennsylvania law.

4. A.B. was first trafficked for commercial sex at the age of eighteen (18) years old. She met her first trafficker online on a dating site, airG.com. She was in need and naïve so when he offered to take her in, she was convinced to travel from Florida to New York to meet him. As soon as she walked into her trafficker's home, her trafficker beat her and raped her. When he was done, A.B. was forced to take pictures for him to post ads on various site advertising sexual service to paying strangers.

5. A.B. was forced by her trafficker to sexually service paying strangers in the form of in and out calls. Her trafficker would make the arrangements for her at Defendant's hotels. A.B. did not see any profits from these transactions with the customers as her trafficker would keep the money she collected. Eventually, A.B. was controlled by an additional trafficker who also sold and required her to sexually service paying strangers as she endured brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at Defendant's hotels as the Defendant did nothing but profit from her exploitation.

6. The Plaintiff now brings this action for damages against the Defendant listed herein. Defendant, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

7. A.B. was advertised on backpage.com and other internet sites against her will, physically tortured, and then sexually exploited under such duress at hotels in Philadelphia. These hotels included The Fairfield Inn® located at 8800 Bartram Avenue; the Renaissance® Philadelphia Airport Hotel located at 500 Stevens Drive; and the Four Points® by Sheraton Philadelphia Airport located at 4101A Island Avenue, Philadelphia, Pennsylvania.

8. As a direct and proximate result of Defendant's consistent refusals to prevent human

trafficking at their hotels, A.B. was sex trafficked, sexually exploited, and victimized repeatedly at Defendant's hotels.

9. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against Defendant who enabled, harbored, held, facilitated, and financially benefited from a sex trafficking venture in which A.B. was trafficked for the purpose of commercial sex, sexually exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

## PARTIES

10. The Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials A.B., was eighteen (18) years old when she was first sold for sex and trafficked throughout in Philadelphia, Pennsylvania. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14). The Plaintiff resides in Florida.

11. Defendant Marriott International, Inc. ("Marriott") is another of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters at 10400 Fernwood Road, Bethesda Maryland, 20817.

    a. Defendant Marriott International, Inc. is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

---

[1] Contemporaneously with the Complaint, Plaintiff A.B. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for Defendant upon proper effectuation of service.

b. As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott International, Inc.

c. Renaissance®, Four Points® by Sheraton, and Fairfield Inn® brand hotels are all Marriott hotels.

d. As a hotel operator, Defendant Marriott controls the training and policies for its hotels including the Renaissance®, Four Points® by Sheraton, and Fairfield Inn® where A.B. was trafficked. Defendant Marriott represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[2]

e. By and through its relationship with the staff at the Renaissance®, Four Points® by Sheraton, and Fairfield Inn®, hotels where A.B. was trafficked and the hotel guest perpetrator who trafficked A.B. at Renaissance®, Four Points® by Sheraton, and Fairfield Inn® hotels, Defendant Marriott knowingly benefited, or received anything of value, from its facilitation of, or participation in, a venture which it knew or should have known to engage in sex trafficking.

f. Marriott receives a percentage of the gross room revenue from the money generated by the operations of Renaissance®, Four Points® by Sheraton, and Fairfield Inn® hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

g. Marriott owns, supervises, and/or operates The Fairfield Inn® by Marriott Philadelphia Airport located at 8800 Bartram Avenue; the Renaissance®

---

[2] Marriott International Inc., Human Rights Policy Statement (July 2017) available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

Philadelphia Airport located at 500 Stevens Drive; and the Four Points® by Sheraton Philadelphia Airport located at 4101A Island Avenue in Philadelphia, Pennsylvania.

h.  Marriott is subject to the jurisdiction of this Court because it regularly transacts business in Pennsylvania, operates dozens of hotels in Pennsylvania, contracts to supply services in Pennsylvania, caused indivisible injuries to the Plaintiff in Pennsylvania, and profited from an illegal sex trafficking venture at its hotels.

12.  Whenever reference is made in this Complaint to any act, deed or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant.

## JURISDICTION AND VENUE

13.  This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States.  The amount in controversy exceeds $75,000.

14.  Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including Defendant's misconduct and omissions, occurred in the judicial district where this action is brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

15.  Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud,

or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

16.    To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse.  Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can then be divided into the two (2) elements remaining: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining" of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

17.    Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

18.    Pursuant to 18 U.S.C. §1591(a), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.  This includes, at a minimum, ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.[3]

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at*

---

[3] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law ***both*** categories are 'traffickers'.

*some point during their exploitation...Unfortunately, 94% also disclosed that they never*

*received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project[1]*

19.    Human trafficking is the world's fastest growing crime.[5]   While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[6]

20.    Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

21.    The hospitality industry plays a crucial role in the sex trade.[7]   The trope of the "no-tell motel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

22.    According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[8]   Traffickers and

---

[4] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[5] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[6] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[7] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[8] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline-statistics.

buyers alike frequently use hotel rooms to exploit victims.

23.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. This is referred to as an 'in call'.

24.     Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[9]

25.     The problem is industry-wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[10]

26.     Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[11] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

27.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify

---

[9] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[10] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[11] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

and thwart sexual exploitation where it is most likely to occur.

28.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply.  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[12]

29.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry.  The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published for the hotel industry over the last decade to help hotel staff in every position to identify the signs.[13]

30.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

31.     Obvious signs of sex trafficking at a hotel may include: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the

---

[12] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[13] DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[14]

32.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[15] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

33.     Hospitality companies can and should mandate that *all* staff working at *all* hotels across their brands complete sex trafficking training.[16]

34.     The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

35.     In 2011, Wyndham Hotels trained only some of its employees to look for signs of

---

[14] *Id. See also,* Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees,* THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[15] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility,* CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[16] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees,* The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

trafficking.[17]

36.    Marriott International claims it amended its Human Rights Policy as early as 2006 to reflect growing concerns regarding human trafficking and reviews the policy annually. To date, the policy merely states, "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention."[18]

37.    Marriott also claims it has supported the anti-trafficking group Polaris since 2010 and in a partnership with EPCAT ((End Child Prostitution, Pornography and Trafficking of Children for Sexual Purposes)) developed a training module in 2010 for hotel management and staff.[19]

38.    Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[20]    These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[21]

---

[17] Katie Lobosco, *Super 8 workers trained to spot sex trafficking*, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[18] Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).
[19] *Human Rights Policy*, MARRIOTT, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited June 6, 2019).
[20] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.
[21] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

39.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

## B.   THE DEFENDANT HELP CONTROL THE HOSPITALITY INDUSTRY

40.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

41.     The average consumer does not see this relationship. The parent brand gives the property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

42.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[22]

43.     The local hotel typically pays around 10% of their total revenue back to the parent

---

[22] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

44.    Per the contract or franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the agreement if the local hotel is found to be inadequate.  The right of the parent hotel brand to enforce their brand standards is also their responsibility.

45.   At the time of the incidents alleged herein:

   a.   Defendant Marriott owned and controlled the Renaissance®, Four Points®, and Fairfield Inn® brands.[23]

46.   Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments so it is seldom done.

## C. DEFENDANT'S WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

47.   Defendant Marriott has been on notice of repeated incidences of sex trafficking occurring across their Renaissance®, Four Points®, and Fairfield Inn® hotels yet these brand managers failed to take the necessary action to prevent sex trafficking within their brand and continue to fail.

48.   Defendant Marriott controls, owns, supervises, or operates The Fairfield Inn® Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport located at 500 Stevens Drive, and the Four Points® by Sheraton Philadelphia Airport located at 4101A Island Ave, in Philadelphia, Pennsylvania.

49.  Marriott failed to implement and enforce any of their own policies and protect Plaintiff

---

[23] Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts, Inc. is now a wholly owned subsidiary of Marriott International Inc.

A.B. from being trafficked.

50.  Founded in 1927, Marriott represents that they have more than Ninety-two (92) years of experience in managing successful brands. From all of their Renaissance®, Four Points®, and Fairfield Inn® hotels, Defendant Marriott receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

51.  Defendant Marriott knew or should have known that the Renaissance®, Four Points®, and Fairfield Inn® hotels where Plaintiff A.B. was trafficked for commercial sex were in areas known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.B. was trafficked.

    a.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Marriott has repeatedly failed to thwart these activities.

    b.  Defendant Marriott can exercise control over Renaissance®, Four Points®, and Fairfield Inn® hotels by:

        i.  distributing information to assist employees in identifying human trafficking;

        ii.  providing a process for escalating human trafficking concerns within the organization;

        iii.  requiring all employees to attend training related to human trafficking;

        iv.  providing new hire orientation on human rights and corporate responsibility;

        v.  providing training and education to Renaissance, Four Points, and Fairfield hotels through webinars, seminars, conferences, and online

portals;

    vi.  developing and holding ongoing training sessions on human trafficking;

    vii.  conducting audits of training protocols; or

    viii.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

c.  Defendant Marriott was in an actual and/or apparent agency relationship with its Renaissance®, Four Points®, and Fairfield Inn® hotels offering public lodging services. This agency relationship was created and is maintained through Defendant Marriott's exercise of an ongoing and systemic right of control over Renaissance®, Four Points®, and Fairfield Inn® hotels by Defendant Marriott's operations, including the means and methods of how Renaissance®, Four Points®, and Fairfield Inn® hotels conduct daily business including:

    i.  hosting online bookings on Defendant Marriott's domain;

    ii.  requiring Renaissance®, Four Points®, and Fairfield Inn® hotels to use Defendant Marriott's customer rewards program;

    iii.  setting parameters on employee wages;

    iv.  making employment decisions;

    v.  advertising for employment;

    vi.  sharing profits;

    vii.  standardized training methods for employees;

    viii.  building and maintaining the facility in a manner specified by Marriott;

    ix.  standardized or strict rules of operation;

      x.   regular inspection of the facility and operation by Marriott;

     xi.   fixing prices; or

    xii.   other actions that deprive Renaissance, Four Points, and Fairfield hotels of any independence in their business operations.

d.  Apparent agency also exists between Defendant Marriott Renaissance®, Four Points® by Sheraton, and Fairfield Inn® by Marriott hotels. Defendant Marriott holds out Renaissance®, Four Points®, and Fairfield hotels® to the public as their direct alter-egos -- each possessing authority to act on the other's behalf.

e.  Given Defendant Marriott's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Marriott breached its duties in the following ways:

    1.  Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    2.  Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization;

    3.  Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    4.  Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    5.  Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

6. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or

7. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

f. For years, Defendant Marriott has failed to address the rampant culture of sex trafficking which tragically occurs throughout its hotels across the country. This entrenched apathy to the real risk of sex trafficking and pervasive willful blindness to the role Renaissance®, Four Points®, and Fairfield Inn® hotels play in sex trafficking facilitated the sex trafficking of Plaintiff K.R. that forms the basis of this complaint hotels across the country. This entrenched apathy to the real risk of sex trafficking allowed the exploitation of Plaintiff A.B. at Renaissance®, Four Points®, and Fairfield Inn® hotels that forms the basis for this complaint.

i. In December of 2014, a man was charged with human trafficking after holding a woman and her toddler hostage at the Four Points® by Sheraton in San Rafael, California. The man held the woman in the hotel against her will and pimped her out while he watched her 2-year-old toddler.[24]

ii. In December of 2014, a traffic stop led to the discovery of a 16-year-old

---

[24] "Hayward man arrested for alleged human trafficking in Marin Hotel," humhttps://www.times-standard.com/2014/12/08/hayward-man-arrested-for-alleged-human-trafficking-in-marin-hotel/

girl who was being sold for sex by a woman at a Four Points® by Sheraton in San Rafael, California.[25]

iii. In August of 2018, a survivor described to the San Francisco Chronicle how her sex trafficking experience started with her being trafficked out of a Four Points® by Sheraton in Emeryville, California.  When she attempted to escape, she was re-captured by her pimp and thrown in the trunk of a car.[26]

iv. In February 2017, a Kansas woman was sentenced to nearly three years in federal prison for the sex trafficking of a teenage girl.  The woman and her husband and co-trafficker had taken the girl to a Fairfield Inn® in Manhattan, Kansas for an out call.[27]

v. In 2013, a 16 year old girl was taken by her trafficker, who was later convicted of his crimes, to a Fairfield Inn® in Dedham, Massachusetts where she was forced to engage in sex acts for his financial gain.[28]

vi. According to crime statistics, from 2012-2017, Houston area Marriott hotels had among the highest number of arrests among hotel chains for commercial sex related crimes.[29]

---

[25] "Police: Woman pimped 16-year-old girl at Marin hotel," https://www.chicoer.com/2014/12/24/police-woman-pimped-16-year-old-girl-at-marin-hotel/
[26] https://www.sfchronicle.com/crime/article/Sex-worker-s-murder-case-testimony-gives-rare-13192240.php
[27] http://www.kake.com/story/34426420/woman-sentenced-in-teen-sex-trafficking-case
[28] https://www.wickedlocal.com/x919096222/Dorchester-man-arrested-in-Quincy-pleads-guilty-to-child-prostitution-charges
[29] https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-for-prostitution-11744958.php

## D.  THE SEX TRAFFICKING OF A.B.

52.   The facts alleged herein stem from multiple sex trafficking rings operating in Pennsylvania and across the country.  While victimized by her traffickers in Pennsylvania, A.B. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at Defendant's hotels.

53.   A.B. was required to have sex for payment with various buyers at Defendant's hotels in response to advertisements for commercial sex that her trafficker posted on Craigslist.com, eros.com and Backpage.com.[30]

54.   A.B.'s trafficker controlled her, punishing her with physical violence every time she did not conform to his abundant rules.

55.   A.B. was forced to perform commercial sex acts on as many as six men in an evening. Each man entered and exited rooms at Defendant's hotels as an unannounced guest.

56.   A.B.'s trafficker and his partner frequently paid for the room one night at a time and always paid in cash.  Regardless, A.B.'s trafficker and his partner would repeat the process multiple times a week.

57.   Prior to, during, and following the incidents described herein, Defendant had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at its hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. Defendant failed to take any actions to curtail

---

[30] Backpage.com was the leading online marketplace for commercial sex, until it was seized by the federal authorities in April 2018. Backpage.com operated in 97 countries and 943 locations worldwide—and was last valued at more than a half-billion dollars. *See* STAFF OF PERMANENT SUBCOMMITTEE ON INVESTIGATIONS; 118TH CONG., REP. ON BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING (Comm. Print 2017).

these activities.

58.     Had Defendant been paying attention to the activities being conducted at its hotels, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

### E. DEFENDANT FACILITATED THE TRAFFICKING OF A.B.

59.     Defendant profited from the sex trafficking of A.B. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendant leased rooms to A.B.'s traffickers, when they knew, or should have known, that they were using the rooms to imprison A.B., physically assault her, and subject her to repeated exploitation as they forced her into sexual servitude.

60.     Defendant knew, or should have known, that A.B. was being trafficked and that Defendant was knowingly benefiting financially from said exploitation, because A.B.'s traffickers frequented Defendant's hotels.

61.     Defendant knew, or should have known, that A.B. was being trafficked because A.B. constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using the Defendant's hotels for his illegal sex trafficking venture.

62.     Defendant actively participated in this illegal endeavor by knowingly or negligently providing lodging to A.B.'s traffickers in which to harbor A.B. while they were trafficking her.

63.     Defendant profited from the sex trafficking of A.B. and knowingly or negligently aided and participated with A.B.'s traffickers in their criminal venture. Defendant took no action as A.B. repeatedly visited the hotel, often with different guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising all over her person.

64.    Defendant actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from A.B. in which to harbor A.B. while she was being trafficked.

65.    Defendant had the opportunity to stop A.B.'s traffickers and offenders like them from victimizing A.B. and others like her.  Instead, Defendant failed to take reasonable measures to stop sex trafficking from occurring in its hotels.

66.    Defendant financially benefited from the sex trafficking of A.B., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

67.    Defendant enjoys the steady stream of income that sex traffickers bring to their hotels.

68.    Defendant financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

69.    Defendant failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation at their hotels.

70.    Defendant maintained these deficiencies to maximize profits by:

    a.  Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    c.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human

trafficking and sexual exploitation;

71.    As a direct and proximate result of these egregious practices on the part of Defendant, A.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### COUNT ONE – 18 U.S.C §1595 ("TVPRA")

72.    The Plaintiff A.B. incorporates each foregoing allegation.

73.    A.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

74.    Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Defendant had a statutory obligation not to benefit financially from a venture that it knew, or should have known, was engaged in violations of 18 U.S.C. §1591 (a).  At all relevant times, Defendant breached this duty by participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

75.    Defendant has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade.  Moreover, Defendant directly benefitted from the trafficking of A.B. on each occasion it received payment for rooms that she was being kept in at Defendant's hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.B.'s injuries and damages.

76.  A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendant's hotels in violation of 18 U.S.C. §1591 (a).

## COUNT TWO – 18 Pa. Cons. Stat. § 3051

77. The Plaintiff A.B. incorporates each foregoing allegation.

78. A.B. is a victim of the sex trade within the meaning of 18 Pa. Cons. Stat. § 3051 and is therefore entitled to bring a civil action under 18 Pa. Cons. Stat. §3051.

79. Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 Pa. Cons. Stat. §3051. Specifically, Defendant had a statutory obligation not to benefit financially from a venture that it knew was engaged in the sex trade. At all relevant times, Defendant breached this duty by knowingly participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

80. Defendant has financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade. Moreover, Defendant directly benefitted from the trafficking of A.B. on each occasion it received payment for rooms that she was being kept in at Defendant's hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.B.'s injuries and damages.

81. A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendant's hotels in violation of 18 U.S.C. §1591 (a).

## PRAYER FOR RELIEF

WHEREFORE on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendant, and that the jury selected award damages to the Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendant's wrongs and injuries

to the Plaintiff due to the Defendant's faulty conduct, including but not limited to:

a. All available compensatory damages for the described losses with respect to each cause of action;

b. past and future medical expenses, as well as the costs associated with past and future life care;

c. past and future lost wages and loss of earning capacity;

d. past and future emotional distress;

e. consequential and/or special damages;

f. all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g. punitive damages with respect to each cause of action;

h. reasonable and recoverable attorneys' fees;

i. costs of this action; and

j. pre-judgment and all other interest recoverable

Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## THE PLAINTIFF DEMANDS A TRIAL BY JURY

Dated: December 9, 2019

**RESPECTFULLY SUBMITTED,**
**PLAINTIFF,**
**By Her Attorneys,**

Jerry Kristal, Esq. (38332)
Weitz & Luxenberg
220 Lake Drive East
Suite 210
Cherry Hill, NJ 08002
Tel No.  856-755-1115
Fax No. 856-755-1995

# EXHIBIT A



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This toolkit offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes posters of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign



# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- **Sex Trafficking**
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. No exceptions.

- **Forced Labor**
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- **Domestic Servitude**
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

## Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.



 # SIGNS OF HUMAN TRAFFICKING
## For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

### GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.
- Individuals show signs of physical abuse, restraint, and/or confinement.
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.
- Individuals lack freedom of movement or are constantly monitored.
- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.
- Individuals have few or no personal items—such as no luggage or other bags.
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.
- A group of girls appears to be traveling with an older female or male.
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

29





# SIGNS OF HUMAN TRAFFICKING

For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

## GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





# SIGNS OF HUMAN TRAFFICKING

For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

### GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

⊗ Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

① Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

☏ Follow your corporate protocol, such as by notifying management and security.

⊛ Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

☉ To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





# SIGNS OF HUMAN TRAFFICKING
## For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

### GENERAL INDICATORS

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to **your** suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign