## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A.B., an individual;<br><br>                Plaintiff<br><br>     -against-<br><br>MARRIOTT INTERNATIONAL, INC.;<br>Defendant. | CIVIL ACTION NO:2:19-CV-05770<br><br>HON. MARK A. KEARNEY<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY TRIAL DEMANDED** |

### COMPLAINT

COMES NOW Plaintiff, A.B., by and through her undersigned counsel, and respectfully submits her first Amended Complaint and makes the following averments.

### INTRODUCTION

1.    For years, sex trafficking ventures have openly operated in and out of Defendant Marriott's hotels as criminals have engaged in misconduct openly at said hotels throughout the United States. Marriott and its hotels remain willfully blind to the criminal misconduct to continued earning a profit from the trafficking of Plaintiff.

2.    Defendant Marriott International, Inc. (hereinafter "Marriott" or "Defendant") knew, and should have known, for more than a decade that sex trafficking repeatedly occurs under its brand flag throughout the country.

3.    Defendant Marriott failed to take timely and effective measures to thwart sex trafficking at its hotels. Marriott ignored the open and obvious presence of sex trafficking at its hotels and derived profit from rooms rented and used for this purpose.

4.    This action for damages is brought by Plaintiff, (hereinafter identified by her initials "A.B."), a victim of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA") and Pennsylvania law.

5.     A.B. was first trafficked for commercial sex at the age of eighteen (18) years old.

6.     A.B. met her first trafficker on an online dating website. After numerous conversations, A.B.'s trafficker took advantage of her naïveté and current needs, and convinced her to travel from Florida to New York to meet him, promising her a relationship and a place to stay.  For years thereafter, A.B. was required by her traffickers to sexually service paying strangers while enduring brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at Defendant's hotels.

7.     Plaintiff now brings this action for damages against Marriott.  Marriott, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

8.     A.B. was kept against her will, physically tortured, and sexually exploited under such duress at various hotels in the Philadelphia area including the Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport Hotel located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Avenue.

9.     As a direct and proximate result of Marriott's consistent refusal and/or failure to take adequate measures to prevent or not profit from human trafficking at its hotels, A.B. was trafficked, sexually exploited, and victimized repeatedly at the Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport Hotel located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Avenue.

10.    Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against Defendants who enabled, harbored, held, facilitated, and

financially benefited from the sex trafficking venture in which she was trafficked for the purpose of commercial sex, systematically exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

## PARTIES

11.   Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials A.B., was eighteen (18) years old when she was first sold for sex and trafficked throughout Philadelphia, Pennsylvania and Jacksonville, Florida.   Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).   Plaintiff currently resides in Florida.

12.   Defendant Marriott is one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its headquarters in Bethesda, Maryland.

  a.   Defendant Marriott International, Inc. is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

  b.   As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott International, Inc.

  c.   Renaissance®, Four Points® by Sheraton, and Fairfield Inn® brand hotels are all Marriott hotels.

  d.   As a hotel operator, Defendant Marriott controls the training and policies for its

---

[1] Contemporaneously with the Complaint [ECF No. 1], Plaintiff A.B. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support [ECF No.2] based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for Defendant upon proper effectuation of service.

hotels including the Renaissance®, Four Points® by Sheraton, and Fairfield Inn® where A.B. was trafficked.  Defendant Marriott represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[2]

e.   Directly and through its relationship with the staff at the Renaissance®, Four Points® by Sheraton, and Fairfield Inn®, hotels where A.B. was trafficked and the hotel guest perpetrator who trafficked A.B. at Renaissance®, Four Points® by Sheraton, and Fairfield Inn® hotels, Defendant Marriott knowingly benefited, or received something of value from its facilitation of or participation in a venture which it knew or should have known engaged in sex trafficking.

f.   Marriott receives a percentage of the gross room revenue from the money generated by the operations of Renaissance®, Four Points® by Sheraton, and Fairfield Inn® hotels, including a percentage of the rate charged on the rooms in which Plaintiff was sex trafficked.

g.   Marriott owns, supervises, and/or operates The Fairfield Inn® by Marriott Philadelphia Airport located at 8800 Bartram Avenue; the Renaissance® Philadelphia Airport located at 500 Stevens Drive; and the Four Points® by Sheraton Philadelphia Airport located at 4101A Island Avenue in Philadelphia, Pennsylvania.

h.   Marriott is subject to the jurisdiction of this Court because it regularly transacts business in Pennsylvania, operates dozens of hotels in Pennsylvania, contracts to

---

[2] Marriott International Inc., Human Rights Policy Statement (July 2017) available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

supply services in Pennsylvania, caused indivisible injuries to Plaintiff in

Pennsylvania, and profited from an illegal sex trafficking venture at its hotels.

13.    Whenever reference is made in this Complaint to any act, deed or conduct of Defendant,

the allegation is that Defendant engaged in the act(s), deed(s), and/or conduct by or through one

or more of its officers, directors, agents, employees, or representatives who was actively

engaged in the management, direction, control, and/or transaction of the ordinary business

and affairs of Defendant.

## JURISDICTION AND VENUE

14.    This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action

arises under the Constitution, laws, or treaties of the United States (with an amount in

controversy that exceeds $75,000.), based upon federal claims asserted pursuant to 18 U.S.C. §

1595.

15.    This is a civil action alleging, *inter alia*, violations of 18 U.S.C. § 2421 and 18 U.S.C. §

1595

16.    This Court has supplemental jurisdiction over A.B.'s state law claims pursuant to 28 U.S.C.

§ 1367, as the state law claims are so related to A.B.'s federal law claims that the claims form

part of the same case or controversy.

17.    Venue is proper within this District Court as this District Court is a judicial district where

Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(2), as

well as the Pennsylvania Long-Arm statute.

18.    Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of

the events or omissions giving rise to the claims asserted in this action, including Defendants'

misconduct and omissions, occurred in the judicial district where this action is brought.

19.    Defendants have consensually submitted to the jurisdiction Pennsylvania and have

purposefully availed themselves of the privilege of conducting acts in Pennsylvania through Marriott's dominion and control over its brand with franchisor subsidiaries, franchisee subsidiaries and operating hotels, and day-to-day operation of the hotels, and, thus, invoking the benefits and protections of the laws in Pennsylvania; Pennsylvania has an equally strong interest in protecting and assuring the safety of persons within its State.

20.   Defendants have consensually submitted to the jurisdiction Pennsylvania and have purposefully availed themselves of the privilege of conducting acts in Pennsylvania which is imputed through the conduct of franchisor subsidiaries, franchisee subsidiaries and operating hotels as a result of Marriott's dominion and control over its brand, thus, invoking the benefits and protections of the laws in Pennsylvania; Pennsylvania has an equally strong interest in protecting and assuring the safety of persons within its State.

## SEX TRAFFICKING UNDER FEDERAL LAW

21.   Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."   This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

22.   While the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

23.   Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking.   This includes, at a minimum, both the 'traffickers' who recruit, harbor, transport, and provide

individuals for forced commercial sex work and the buyers who obtain, solicit, and/or patronize forced commercial sex work. Both the 'traffickers' and buyers therefore trafficked Plaintiff and paid for rooms from which Defendants profited.[3]

## FACTUAL ALLEGATIONS

### A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

24.   "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff." The Polaris Project.[4]

25.   Reports by The Polaris Project were received and reviewed by the executives, directors and managers of Marriott.

26.   Upon information and belief, other publically available information regarding trafficking in hotels was received and reviewed by Defendant during the time period 2009 to 2014.

27.   Upon information and belief, between at least 2009 and 2014, Defendant held meetings among its executives, directors and managers at which sex trafficking in hotels was discussed.

28.   Upon information and belief, during at least the 2009 to 2014 time period, emails were exchanged by employees of Defendant that related to sex trafficking in hotels including Defendants' hotels.

29.   Defendant played a crucial role in the sex trade, as do all hotels.[5]

30.   Defendant permitted anonymity to the buyers and non-traceability, making them ideal

---

[3] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law *both* categories are 'traffickers'.
[4] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels- recommendations (last visited June 19, 2019)
[5] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

venues for sex traffickers to sell Plaintiff for sex.

31.    Defendant knew or should have known that the anonymity for buyers and non-traceability of their presence at its hotels made their hotels ideal venues that were indeed used for sex trafficking.

32.    Defendant, prior to the information being known publically, knew or should have known, that hotels are the top-reported venue where sex trafficking acts occur.[6]

33.    Marriott knew or should have known that trafficking was taking place from at least 2009 – 2014 at the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport.

34.    Marriott knew that traffickers used its hotels, including the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport as hubs of operations. Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

35.    Defendant knew or should have known that this is referred to as an "in call."

36.    Marriott knew or should have known that its hotels, including the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their

---

[6]    *National   Human   Trafficking   Hotline   Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

home, naturally leading to the increased involvement of hotels.

37.   At all relevant times herein,  Defendant knew or should have known that sex trafficking in hotels was industry wide, included its hotels, and that a significant portion of all sex trafficking was taking place at its hotels.[7]

38.   Due to the complacency of Defendant on addressing the issue, hotels are *the* venue of choice for sex trafficking.[8]

39.   From at least 2009-2014 and to date, traffickers and buyers used and use hotel rooms, including those rented by Defendant, due to Defendant's failure and/or refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

40.   Upon information and belief, prior to 2014, and despite a duty to do so, Marriott took no measures to prevent sex trafficking at its hotels or profiting from sex trafficking at its hotels.

41.   Upon information and belief, prior to 2014, Marriott, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its hotels or profiting from sex trafficking at its hotels, including the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport.

42.   Upon information and belief, Defendant, through its employees, including executives, directors and managers, decided not to take any measures to prevent sex trafficking at its hotels in order to conceal the fact that sex trafficking was occurring at its hotels.

---

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[8] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

43.   Upon information and belief, each year, from at least 2009 until 2014, Defendant received information indicating that sex trafficking had occurred at one of its hotels.

44.   Upon information and belief, each year, from 2009 until 2014, Defendant received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its hotels.

45.   At all relevant times, Defendant had the financial resources to train hotel staff to identify the signs of sex trafficking.

46.   At all relevant times, Marriott had the authority to require that training of hotel staff to identify the signs of sex trafficking take place including at the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport and to compel and ensure that such training take place.

47.   From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel.  With proper training and the implementation of reasonable security measures, Defendant could have prevented and identified regular sex trafficking under its respective flag.

48.   Obvious signs of sex trafficking at Defendant's hotels included: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest

controlling another's identification documents.[9]

49.  Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[10] For this reason, hospitality companies, including Marriott, are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

50.  Hospitality companies, including Marriott, can and should mandate that *all* staff working at *all* hotel properties across their brands complete sex trafficking training.[11]

51.  In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking – including Marriott -- to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

52.  The hospitality industry and Defendant have been cognizant of their role and responsibilities in the sex trafficking industry for years.

53.  In 2012, an anti-trafficking coalition alerted Choice Hotels, Accor, Best Western, Hilton, Hyatt, Intercontinental Hotels Group, Marriott, Starwood, and Wyndham of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[12]

---

[9] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[10] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[11] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[12] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

54.   Defendant Marriott knew, as of at least early 2006, that human trafficking was occurring in its hotels and across its brand.  Because of this, Defendant Marriott amended its Human Rights Policy as early as 2006 to require annual review of its policy. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [13]

55.   Further, nationwide campaigns, that Defendant was the target of and subject to, recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[14]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[15]

56.   The presence of sex trafficking and exploitation in hotels is an obvious occurrence and although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published for the hotel industry over the last decade to help hotel staff in every position to identify the signs.[16]

57.   Marriott has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors including those discussed above for years.

---

[13]   Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

[14]   *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[15]   *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[16]   DEPARTMENT OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue- campaign/toolkits/hospitality-toolkit-eng.pdf.

58.   For years, Marriott has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking in its hotels and the most effective means in which that trafficking could be stopped.

59.   Despite its knowledge of sex trafficking in its hotels and efforts undertaken or laid out by others to stop such trafficking, Marriott did nothing to stop the sex trafficking at its hotels.

60.   When Marriott eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only.

61.   Hospitality companies, including Defendant, have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies.  Instead, they continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B.   MARRIOTT CONTROLS THEIR LOCAL HOTELS

62.   Hotel brands or flags, including Defendant, lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

63.   The average consumer does not see this relationship.  The parent brand, including Defendant, gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand is emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

64.   In addition to brand recognition, a marketing organization, hotel listings in the Global

Distribution System (GDS) and other online travel agency databases, the brand provides the local

hotel with access to its brand wide central reservation system, 800 number, revenue management

tools, world-class loyalty programs and a website.  Thus, booking and room reservations are

controlled by Defendant.[17]

65.   Upon information and belief, the Fairfield Inn® by Marriott – Philadelphia Airport, the

Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia

Airport pays around 10% of their total revenue back to Marriott and is required to develop and

maintain the property in accordance with Marriott's brand standards as they are laid out in the

franchise agreement.

66.   Upon Information and belief, per the contract or franchise agreement, defendant Marriott

may enforce these standards through periodic inspections and even termination of the agreement

if the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport

Hotel, or the Four Points® by Sheraton – Philadelphia Airport is found to be inadequate.  The

right of Marriott, as the parent hotel brand, to enforce their brand standards is also its own

responsibility.

67.   At the time of the incidents alleged herein Marriott owned and controlled Renaissance®,

Fairfield Inn® by Marriott, and Four Points® by Sheraton.[18]

68.   Marriott could have kicked the Fairfield Inn® by Marriott – Philadelphia Airport, the

Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia

Airport out of its system as delinquent but it would have been done at the expense of terminating

royalty payments so it was not done.

---

[17] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018)
https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.
[18] Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts, Inc. is now a wholly owned subsidiary of
Marriott International Inc.

## C.  MARRIOTT'S WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

69.   Defendant Marriott has been on notice of repeated incidences of sex trafficking occurring across their Renaissance®, Four Points®, and Fairfield Inn® hotels yet these brand managers failed to take the necessary and effective action to prevent sex trafficking and still persist in failing to take the necessary action to prevent se trafficking at their hotels.

70.   Defendant Marriott controls, owns, supervises, or operates The Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Ave, in Philadelphia, Pennsylvania.

71.   Marriott failed to implement and enforce any of their own policies and protect Plaintiff A.B. from being trafficked.

72.   Founded in 1927, Marriott represents that they have more than Ninety-two (92) years of experience in managing successful brands.  From all of their Renaissance®, Four Points®, and Fairfield Inn® hotels, Defendant Marriott receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

73.   Defendant Marriott knew or should have known that the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport where Plaintiff A.B. was trafficked for commercial sex were in areas known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.B. was trafficked.

74.   Despite having actual or constructive knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Marriott has repeatedly

failed to thwart these activities.

75.   Defendant Marriott can exercise control over the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport:

      a.   distributing information to assist employees in identifying human trafficking;

      b.   providing a process for escalating human trafficking concerns within the organization;

      c.   requiring all employees to attend training related to human trafficking;

      d.   providing new hire orientation on human rights and corporate responsibility;

      e.   providing training and education to the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport through webinars, seminars, conferences, and online portals;

      f.   developing and holding ongoing training sessions on human trafficking;

      g.   conducting audits of training protocols; or

      h.   providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

76.   Defendant Marriott is/was in an agency relationship with Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport offering public lodging services. This agency relationship was created and is maintained through Defendant Marriott's exercise of an ongoing and systemic right of control over Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance®

Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport by Defendant Marriott's operations, including the means and methods of how Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport conduct daily business including:

    a.  hosting online bookings on Defendant Marriott's domain;

    b.  requiring Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport to use Defendant Marriott's customer rewards program;

    c.  setting parameters on employee wages;

    d.  making employment decisions;

    e.  advertising for employment;

    f.  sharing profits;

    g.  standardized training methods for employees;

    h.  building and maintaining the facility in a manner specified by Marriott;

    i.  standardized or strict rules of operation;

    j.  regular inspection of the facility and operation by Marriott;

    k.  fixing prices; or

    l.  other actions that deprive Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport of any independence in their business operations.

77.  An actual and/or apparent agency also exists between Defendant Marriott and the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport. Defendant Marriott holds out the

Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport as possessing authority to act on its behalf.

78.   Given Defendant Marriott's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Marriott breached its duties in the following ways:

    a.   Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    b.   Failed (altogether or adequately) to provide a process  for escalating human trafficking concerns within the organization.

    c.   Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    d.   Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    e.   Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f.   Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or

    g.   Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

79.   For years, Defendant Marriott has failed to address the rampant culture of sex trafficking which tragically occurs throughout its hotels across the country. This entrenched apathy to the

real risk of sex trafficking and pervasive willful blindness to the role its hotels play in sex trafficking, facilitated the sex trafficking of Plaintiff K.R. at the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport that forms the basis for this complaint.

    a.   In December of 2014, a man was charged with human trafficking after holding a woman and her toddler hostage at the Four Points® by Sheraton in San Rafael, California. The man held the woman in the hotel against her will and pimped her out while he watched her 2-year-old toddler.[19]

    b.   In December of 2014, a traffic stop led to the discovery of a 16-year-old girl who was being sold for sex by a woman at a Four Points® by Sheraton in San Rafael, California.[20]

    c.   In August of 2018, a survivor described to the San Francisco Chronicle how her sex trafficking experience started with her being trafficked out of a Four Points® by Sheraton in Emeryville, California.  When she attempted to escape, she was re-captured by her pimp and thrown in the trunk of a car.[21]

    d.   In February 2017, a Kansas woman was sentenced to nearly three years in federal prison for the sex trafficking of a teenage girl.  The woman and her husband and co-trafficker had taken the girl to a Fairfield Inn® in Manhattan, Kansas for an out call.[22]

---

[19] "Hayward man arrested for alleged human trafficking in Marin Hotel," humhttps://www.times-standard.com/2014/12/08/hayward-man-arrested-for-alleged-human- trafficking-in-marin-hotel/
[20] "Police: Woman pimped 16-year-old girl at Marin hotel," https://www.chicoer.com/2014/12/24/police-woman-pimped-16-year-old-girl-at-marin-hotel/
[21] https://www.sfchronicle.com/crime/article/Sex-worker-s-murder-case-testimony-gives-rare-13192240.php
[22] http://www.kake.com/story/34426420/woman-sentenced-in-teen-sex-trafficking-case

e.  In 2013, a 16 year old girl was taken by her trafficker, who was later convicted of his crimes, to a Fairfield Inn® in Dedham, Massachusetts where she was forced to engage in sex acts for his financial gain.[23]

f.  According to crime statistics, from 2012-2017, Houston area Marriott hotels had among the highest number of arrests among hotel chains for commercial sex related crimes.[24]

### D.  THE SEX TRAFFICKING OF A.B.

80.  The facts alleged herein stem from multiple sex trafficking rings operating in Pennsylvania and across the country.  While victimized by her traffickers in Pennsylvania, A.B. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at Defendant's hotels.

81.  When A.B. was 18 years old and living in St. Augustine, Florida when she met her first trafficker on the internet. In January 2009, her trafficker lured her to New York under the guise of a romantic relationship when he took her to a hotel and violently raped her.

82.  For years thereafter, A.B. was required to have sex for payment with various buyers at Defendant's hotels in response to advertisements for commercial sex that her various traffickers posted online.

83.  A.B. was with her initial trafficker in New York for about 3-4 weeks when she was bought by another trafficker.

84.  A.B.'s trafficker controlled her, punishing her with physical violence every time she did not conform to his abundant rules. A.B. was expected to meet quotas for her trafficker and would

---

[23]https://www.wickedlocal.com/x919096222/Dorchester-man-arrested-in-Quincy-pleads-guilty-       to-child-prostitution-charges

[24]https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-       for-prostitution-11744958.php

be punished by him regularly for failing to meet the quotas.

85.  A.B.'s trafficker took her across state lines and would sell her out of hotels in states including Pennsylvania, New Jersey, and New York.

86.  Between the years of 2009-2011, A.B. was trafficked for days at a time at the Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport Hotel located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Avenue in Philadelphia, Pennsylvania.

87.  At the Fairfield Inn® by Marriott – Philadelphia Airport, A.B. was compelled by her trafficker to complete in-calls and service buyers. A.B. was forced to perform commercial sex acts on as many as six men an evening. Each man entered and exited the rooms at the Fairfield Inn® by Marriott – Philadelphia Airport as an unannounced guest.  There was a constant stream of male visitors to her room straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious.

88.  A.B.'s trafficker and his partner frequently paid for the rooms at the Fairfield Inn® by Marriott – Philadelphia Airport for at least a week at a time with a prepaid credit card. A.B.'s trafficker and his partner would repeat the process regularly. The rooms at the Fairfield Inn® by Marriott – Philadelphia Airport were always pre-paid and so the hotel staff was aware that A.B. was there often.

89.  A.B.'s trafficker would bring her to the Fairfield Inn® by Marriott – Philadelphia Airport with very limited personal belongings, and little if any luggage. A.B. was also prohibited from having a phone, wallet, or any form of identification.

90.  The rooms A.B. was kept in at the Fairfield Inn® by Marriott – Philadelphia Airport were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in

the rooms.

91.    To the staff at the Fairfield Inn® by Marriott – Philadelphia Airport, A.B. showed signs of visible injury on more than one occasion and there were frequently loud altercations.

92.    The attacks on A.B. by her traffickers at the Fairfield Inn® by Marriott – Philadelphia Airport were constant and loud enough for the hotel patrons and staff to hear.

93.    At the Renaissance® Philadelphia Airport Hotel, A.B. was compelled by her trafficker to complete in-calls and service buyers. A.B. was forced to perform commercial sex acts on as many as six men an evening. Each man entered and exited the rooms at the Renaissance® Philadelphia Airport Hotel as an unannounced guest.  There was a constant stream of male visitors to A.B.'s room straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious.

94.    A.B.'s trafficker and his partner frequently paid for the rooms at Renaissance® Philadelphia Airport Hotel for at least a week at a time with a prepaid credit card. A.B.'s trafficker and his partner would repeat the process regularly. The rooms at the Renaissance® Philadelphia Airport Hotel were always pre-paid and so the hotel staff was aware that A.B. was there often.

95.    A.B.'s trafficker would bring her to the Renaissance® Philadelphia Airport Hotel with very limited personal belongings, and little if any luggage. A.B. was also prohibited from having a phone, wallet, or any form of identification.

96.    The rooms A.B. was kept in at the Renaissance® Philadelphia Airport Hotel were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms.

97.    To the staff at the Renaissance® Philadelphia Airport Hotel, A.B. showed signs of visible injury on more than one occasion and there were frequently loud altercations.

98.   The attacks on A.B. by her traffickers at the Renaissance® Philadelphia Airport Hotel were constant and loud enough for the hotel patrons and staff to hear.

99.   At the Four Points® by Sheraton – Philadelphia Airport, A.B. was compelled by her trafficker to complete in-calls and service buyers. A.B. was forced to perform commercial sex acts on as many as six men an evening. Each man entered and exited the rooms at the Four Points® by Sheraton – Philadelphia Airport as an unannounced guest.  There was a constant stream of male visitors to A.B.'s room straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious.

100.   A.B.'s trafficker and his partner frequently paid for the rooms at Four Points® by Sheraton – Philadelphia Airport for at least a week at a time with a prepaid credit card. A.B.'s trafficker and his partner would repeat the process regularly. The rooms at the Four Points® by Sheraton – Philadelphia Airport were always pre-paid and so the hotel staff was aware that A.B. was there often.

101.   A.B.'s trafficker would bring her to the Four Points® by Sheraton – Philadelphia Airport with very limited personal belongings, and little if any luggage. A.B. was also prohibited from having a phone, wallet, or any form of identification.

102.   The rooms A.B. was kept in at the Four Points® by Sheraton – Philadelphia Airport were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms.

103.   To the staff at the Four Points® by Sheraton – Philadelphia Airport, A.B. showed signs of visible injury on more than one occasion and there were frequently loud altercations.

104.   The attacks on A.B. by her traffickers at the Four Points® by Sheraton – Philadelphia Airport were constant and loud enough for the hotel patrons and staff to hear.

105.  A.B.'s trafficker continued to force her to service buyers for the next 5 years.

106.  Prior to, during, and following the incidents described herein, Marriott had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at its hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. Marriott failed to take any actions to curtail these activities.

107.  Had Defendant been paying attention to the activities being conducted at its hotels, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

### E. MARRIOTT FACILITATED THE TRAFFICKING OF A.B.

108.  Marriott profited from the sex trafficking of A.B. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. Marriott leased rooms to A.B.'s traffickers, when they knew, or should have known, that they were using the rooms to imprison A.B., physically assault her, and subject her to repeated exploitation as they forced her into sexual servitude.

109.  Marriott knew, or should have known, that A.B. was being trafficked and that they were knowingly benefiting financially from said exploitation, because A.B.'s traffickers frequented Marriott's hotels.

110.  Marriott knew, or should have known, that A.B. was being trafficked because A.B. constantly entertained traffic to appease her traffickers' demands, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using Marriott's hotels for his illegal sex trafficking venture.

111.  Marriott actively participated in this illegal endeavor by knowingly or negligently providing

lodging to A.B.'s traffickers in which to harbor A.B. while they were trafficking her.

112. Marriott profited from the sex trafficking of A.B. and knowingly or negligently aided and participated with A.B.'s traffickers in their criminal venture. Marriott took no action as A.B. repeatedly visited its hotels, entertained numerous guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising or injury all over her person.

113. Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from A.B. in which to harbor A.B. while she was being trafficked.

114. Marriott had the opportunity to stop A.B.'s traffickers and offenders like them from victimizing A.B. and others like her. Instead, Marriott failed to take reasonable measures to stop sex trafficking from occurring in its hotels.

115. Marriott financially benefited from the sex trafficking of A.B., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

116. Marriott enjoyed the steady stream of income that sex traffickers bring to its hotels.

117. Marriott benefits financially from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

118. Marriott failed to take steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation at their hotels.

119. Marriott maintained these deficiencies to maximize profits by:

      a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

    b.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    c.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

120. As a direct and proximate result of these egregious practices on the part of Marriott, A.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### COUNT ONE – 18 U.S.C §1595 ("TVPRA")

121. Plaintiff A.B. incorporates each foregoing allegation.

122. A.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

123. Marriott's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Marriott had a statutory obligation not to benefit financially from a venture that it knew, or should have known, was engaged in violations of 18 U.S.C. §1591 (a).   At all relevant times,  Marriott breached this duty by participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

124. Marriott financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade.  Moreover, Marriott directly benefitted

from the trafficking of A.B. on each occasion it received payment for rooms that she was being kept in at Defendant's hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.B.'s injuries and damages A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Marriott's hotels in violation of 18 U.S.C. §1591 (a).

## COUNT TWO – 18 Pa. Cons. Stat. § 3051

125.   Plaintiff A.B. incorporates each foregoing allegation.

126.   A.B. is a victim of the sex trade within the meaning of 18 Pa. Cons. Stat. § 3051 and is therefore entitled to bring a civil action under 18 Pa. Cons. Stat. §3051.

127.   Marriott's acts, omissions, and commissions, outlined above, constitute a violation of 18 Pa. Cons. Stat. §3051. Specifically, Marriott had a statutory obligation not to benefit financially from a venture that it knew was engaged in the sex trade.   At all relevant times, Marriott breached this duty by knowingly participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by its acts, omissions, and commissions.

128.   Marriott financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade.   Moreover, Marriott directly benefitted from the trafficking of A.B. on each occasion that they received payment for rooms that she was being kept in at Marriott hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.B.'s injuries and damages.

129.   A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Marriott' hotels in violation of 18 U.S.C. §1591 (a).

## **PRAYER FOR RELIEF**

WHEREFORE based on the forgoing, Plaintiff seeks injunctive relief in the form of judgement requiring the Marriott to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated to Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, Plaintiff requests that a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendant, and that the jury selected award damages to Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of Defendant's wrongs and injuries to Plaintiff due to Defendant's faulty conduct, including but not limited to:

a)  All available compensatory damages for the described losses with respect to each cause of action;

b)  past and future medical expenses, as well as the costs associated with past and future life care;

c)  past and future lost wages and loss of earning capacity;

d)  past and future emotional distress;

e)  consequential and/or special damages;

f)  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g)  punitive damages with respect to each cause of action;

h)  reasonable and recoverable attorneys' fees;

i)  costs of this action; and

j)  pre-judgment and all other interest recoverable.

Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated: March 12, 2020

RESPECTFULLY SUBMITTED, PLAINTIFF,

**By Her Attorneys,**

Weitz & Luxenberg, P.C.
200 Lake Drive East
Suite No. 205
Cherry Hill, NJ 08002
Tel: (856) 755-1115
Fax: (856) 755-1995

# <u>EXHIBIT A</u>



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This toolkit offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes posters of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign



# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- Sex Trafficking
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. No exceptions.

- Forced Labor
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- Domestic Servitude
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

## Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.





# SIGNS OF HUMAN TRAFFICKING
## For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

### GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.

- Individuals show signs of physical abuse, restraint, and/or confinement.

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.

- Individuals lack freedom of movement or are constantly monitored.

- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.

- Individuals have few or no personal items—such as no luggage or other bags.

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.

- A group of girls appears to be traveling with an older female or male.

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





# SIGNS OF HUMAN TRAFFICKING

## For **Housekeeping, Maintenance,** and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

### GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

### GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

Follow your corporate protocol, such as by notifying management and security.

Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign





# SIGNS OF HUMAN TRAFFICKING

## For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

### GENERAL INDICATORS

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign