**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **A.B.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  19-5770** |
| | : | |
| **MARRIOTT INTERNATIONAL, INC.** | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                 **April 22, 2020**

Approximately twelve years ago, Congress added language to its prohibition on sex trafficking law allowing victims to seek a monetary remedy from a person or legitimate business which knowingly benefitted, financially or by receiving anything of value, from participating in a venture which it knew or should have known engaged in sex trafficking. In the last several months, sex trafficking victims have filed over twenty cases around the country against hotels.  We today address A.B.'s claims against Marriott International arising from trafficking of her at three Philadelphia airport hotels from 2009 to 2011. She sues under both the federal law and Pennsylvania's human trafficking statute which requires knowledge.   Marriott is the franchisor; it does not own these three hotels.  It now moves to dismiss arguing the sex trafficking laws cannot, as a matter of law, apply to it.  We agree A.B. does not plead facts after two attempts allowing us to reasonably infer Marriott knew of sex trafficking victimizing her.  But A.B. sufficiently pleads specific facts from which we can reasonably infer Marriott, under an actual agency theory subject to discovery, knowingly benefitted from participating in a venture which it should have known engaged in her trafficking.  This is all Congress requires a victim to plead.  But she does not timely plead her Pennsylvania claim, nor does she plead facts allowing us to infer Marriott's knowledge under Pennsylvania's human trafficking statute.  We proceed to discovery on Marriott's potential liability if a jury finds it should have known of the sex trafficking in the three airport hotels.

I.    **Alleged Facts**

In 2009, eighteen year old A.B. met a sex trafficker online who convinced her to travel from her home in Florida to New York under the guise of a romantic relationship.[1]  After arriving in New York, A.B. alleges her trafficker beat and raped her, and forced her into commercial sex trafficking in New York for approximately three to four weeks when another trafficker "bought" her.[2]  From 2009 to 2011, the second trafficker forced A.B. into commercial sex acts for days at a time at Marriott International owned hotels at the Philadelphia Airport: the Fairfield Inn by Marriott – Philadelphia Airport; Renaissance Philadelphia Airport Hotel; and Four Points by Sheraton Philadelphia Airport.[3]  A.B.'s trafficker forced her to sexually service paying strangers in the form of "in call[s]" and "out call[s]" at Marriott's Philadelphia Airport hotels.[4]

Between 2009 and 2011, her traffickers forced her into "in calls" at the three Marriott owned Philadelphia Airport hotels by as many as six men an evening.[5]  Each man entered and exited rooms at the three Philadelphia Airport hotels, and a "constant stream of male visitors" went to her room "straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious."[6]  Her traffickers frequently paid for rooms at all three hotels for at least a week at a time with a prepaid credit card and hotel staff were aware of A.B.'s presence there.[7]  A.B.'s traffickers brought her to each hotel with little, if any, luggage and she did not have a phone, wallet, or any form of identification.[8]  The hotel rooms where she performed commercial sex acts "were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms."[9]  The staff at each of the three hotels saw signs of her visible injury and were aware of frequent "loud altercations" as well as "constant" attacks on her by her trafficker loud enough for staff and hotel patrons to hear.[10]

Her trafficker continued to force her into commercial sex for five years.[11]  A.B. avers Marriott through hotel video surveillance and complaints regarding "suspicious activity" had actual or constructive notice of drug dealing, prostitution, "and/or general safety concerns at its hotels."[12]  If Marriott paid attention to these activities at its hotels, including the "red flags" surrounding A.B.'s trafficking, she believes "it would have been impossible for them not to notice [her] victimization."[13]

### *The hospitality industry's participation in sex trafficking.*

The hospitality industry generally knows of its role in securing the private rooms for the sex trafficking industry in exchange for room rentals.[14]  The Polaris Project, a national organization combating sex trafficking, issued reports beginning in 2015 regarding the role of hotels and motels in sex trafficking.[15]  Marriott executives, directors, and managers received and reviewed Polaris Project reports.[16]  From 2009 to 2014, Marriott executives, directors, and managers also reviewed other information from publicly available sources regarding sex trafficking in hotels and met to discuss sex trafficking in their hotels.[17]

Marriott "permitted anonymity to the buyers and non-traceability, making them ideal venues for sex traffickers to sell [A.B.] for sex."[18]  A.B. asserts Marriott knew or should have known such anonymity "made their hotels ideal venues" for sex trafficking and knew or should have known hotels are "the top-reported venue where sex trafficking acts occur."[19]

A.B. specifically pleads Marriott knew or should have known sex trafficking in their Philadelphia Airport hotels between 2009 and 2014, including the practices of "in calls" and "out calls" and failed to adopt and enforce anti-trafficking policies from the corporate level to the "property level," failed to train staff on how to detect and respond to sex trafficking, failed to establish safe and secure reporting mechanisms at local hotels, and failed to take measures to

prevent sex trafficking at its hotels to conceal sex trafficking occurring at its hotels.[20]  Despite its knowledge of sex trafficking in its hotels, Marriott did nothing to stop it, and, when Marriott eventually began to adopt policies to combat sex trafficking, "it did so in appearance only."[21]

### *Marriott's control over the three Airport hotels.*

Marriott sells its brand name and marketing power to third-party owners for use for building and operations run by a franchisee or third-party management company under Marriott's control.[22]  The three Philadelphia Airport hotels where traffickers housed A.B. pay approximately ten percent of their total revenue to Marriott.[23]  Each franchisee owner is contractually required to develop and maintain the property in accordance with Marriott's brand standards required by the franchise agreement.[24]  Marriott may enforce its standards through periodic inspection, and even termination of the agreement if its hotels are found to be inadequate.[25]

### *Marriott's actual and/or apparent agency relationship with its Philadelphia Airport hotels and willful blindness of sex trafficking at their hotels.*

A.B. alleges Marriott has or had an agency relationship with each of the three Philadelphia Airport hotels created by Marriott's "exercise of an ongoing and systematic right of control" over the three hotels including: hosting online bookings on Marriott's domain; requiring the three hotels to use Marriott's customer rewards program; setting employee wages; making employment decisions and advertising for employment; sharing profits; standardizing employee training; building and maintaining the facility as specified by Marriott; standardized rules of operation; regulation site inspections; fixing pricings, and other actions depriving the three hotels from any independence in their business operations.[26] A.B. alleges an actual and/or apparent agency exists between Marriott and the three hotels because Marriott holds out the three hotels as possessing authority to act on its behalf.[27]

A.B. alleges Marriott knew or should have known its three Philadelphia Airport hotels were in areas known for high incidences of crime and prone to sex trafficking during the time of A.B.'s victimization.[28]  Despite having actual or constructive knowledge of sex trafficking at their hotels, A.B. alleges Marriott repeatedly failed to thwart this activity and its apathy to the risk of sex trafficking and willful blindness to the role its hotels play in sex trafficking facilitated A.B.'s trafficking at its three Philadelphia Airport hotels.[29]

A.B. alleges Marriott "breached its duties" by failing, altogether or adequately, to "distribute information to assist employees in identifying human trafficking;" "provide a process for escalating human trafficking concerns within the organization;" require "managers, employees, or owners attend training relating to human trafficking;" "provide new hire orientation on human rights and corporate responsibility;" "provide training and education on human trafficking through webinars, seminars, conferences, and online portals;" "develop and hold or require ongoing training sessions on human trafficking;" and/or "provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention."[30]  A.B. alleges Marriott should have known about sex trafficking in its Philadelphia Airport hotels because of six incidents of trafficking in 2012 through 2018 in Marriott International owned hotels in California, Kansas, Massachusetts, and Texas.[31]

### Marriott facilitated A.B.'s trafficking.

A.B. alleges Marriott profited from A.B.'s sex trafficking and knowingly or negligently aided and engaged her trafficker in his venture by leasing rooms to her trafficker when it knew, or should have known, the rooms were being used for sexual servitude.[32]  A.B. alleges Marriott knew or should have known about A.B.'s trafficking because of the trafficker's frequent use of the hotels; constant traffic in the hotels; the trafficker's assistance in checking-in A.B. but not

proceeding to the room; and A.B.'s appearance without luggage, her avoidance of eye contact, and prominent bruising and injury on her body.[33]  A.B. alleges despite these signs of sex trafficking, Marriott failed to act and instead financially benefitted from the business brought by traffickers to its hotels.[34]

### A.B. sued Marriott on December 9, 2019 while the Judicial Panel on Multidistrict Litigation considered centralizing similar litigation.

On December 9, 2019, A.B. sued Marriott for physical and psychological injuries resulting from sex trafficking and exploitation under section 1595 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 providing victims of sex trafficking with a civil remedy for damages against their traffickers and "whoever" knowingly benefits from participation in a venture the person knew or should have known engaged in sex trafficking.[35]  She also alleged Marriott's knowing conduct violated Pennsylvania's human trafficking statute, 18 Pa. Cons. Stat. § 3051.[36]  The same day, plaintiffs in six similar actions moved before the United States Judicial Panel on Multidistrict Litigation in *In re: Hotel Industry Sex Trafficking Litigation* to centralize a proposed multidistrict litigation in the United States District Court for the Southern District of Ohio.[37]  Plaintiffs sought to centralize twenty-one actions pending in twelve district courts, including A.B.'s action in this District.  Of the twenty actions in addition to this case, six are in the United States District Court for the Southern District of Ohio and five in the United States District Court for the Northern District of Georgia, with the remaining cases in the United States District Courts for the District of Massachusetts, the Eastern District of Michigan, District of New Hampshire, Eastern District of New York, Northern District of New York, District of Oregon, Southern District of Texas, Eastern District of Virginia, and Western District of Washington.[38]

On February 5, 2020, the Panel denied centralization.[39]  Marriott moved to dismiss A.B.'s complaint on February 20, 2020.[40]  A.B. filed an amended complaint.[41]  Marriott now moves to dismiss A.B.'s amended complaint. [42]

## II.        Analysis[43]

A.B. seeks damages against Marriott under the Act's civil remedy provision.  As analyzed below, Congress authorized a civil remedy for victims of sex trafficking under section 1595 of the Act.  A.B. also seeks damages under Pennsylvania's human trafficking statute.  Marriott moves to dismiss both claims with prejudice.

To survive a Rule 12(b)(6) motion to dismiss, A.B. must plead "enough facts to state a claim to relief that is plausible on its face."[44]  Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" to "give the defendant fair notice of what the … claim is and the grounds upon which it rests."[45]  A complaint making "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" is insufficient.[46]

Marriott moves to dismiss A.B.'s amended complaint arguing: (1) A.B. fails to state a claim under section 1595 of the Act; (2) A.B. fails to allege facts to support Marriott's vicarious liability for the actions of the Philadelphia hotels where A.B. alleges trafficking occurred; (3) A.B.'s "shotgun" pleading fails to satisfy Federal Rule of Civil Procedure 8(a); and (4) A.B.'s claim under the Pennsylvania statute fails, is untimely, and Marriott is exempt from liability as a matter of law.

A.B. argues she sufficiently and plausibly (1) states a claim under section 1595 of the Act; (2) alleges Marriott's direct liability as a financial beneficiary of sex trafficking under the Act; (3) alleges Marriott's indirect liability for facilitating sex trafficking under an agency relationship with its franchisee hotels; and (4) states a claim under Pennsylvania's human trafficking statute.[47]

A.      **Congress provides A.B. with a civil remedy against both traffickers and those facilitating trafficking.**

Congress passed the Trafficking Victims Protection Act of 2000 "[t]o combat trafficking in persons, especially into the sex trade, slavery, and involuntary servitude, to reauthorize certain Federal programs to prevent violence against women, and for other purposes."[48]  The legislation created criminal offenses for forced labor and sex trafficking.

In 2003, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003.[49]  Congress found since enactment of the 2000 legislation, the United States "made significant progress in investigating and prosecuting acts of trafficking and in responding to the needs of victims of trafficking in the United States and abroad [but] [o]n the other hand, victims of trafficking have faced unintended obstacles in the process of securing needed assistance …."[50]  Among other amendments, Congress created a civil right of action by victims of trafficking against their traffickers:

(a) An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees.…[51]

The 2003 version of the Act provided a civil remedy against the trafficker only.  Congress expanded victims' remedies in 2008 when it passed the William Wilberforce Trafficking Victims Protection Reauthorization Act expanding civil liability to those who facilitate trafficking ventures.  Congress amended section 1595 by striking the words "of section 1589, 1590, or 1591"; inserting "(or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)" after "perpetrator"; and by adding a ten year statute of limitations.[52]

(a) An individual who is a victim of a violation ~~of section 1589, 1590, or 1591~~ of this chapter may bring a civil action against the perpetrator <u>(or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or</u>

should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees….[53]

In the 2008 legislation, Congress gave "victims a cause of action against those who have profited from their exploitation" and "creates a cause of action for victims of any violation of chapter 77[54] *against anyone who benefits from any such a violation*."[55]  Section 1595 "opened the door for liability against facilitators who did not directly traffic the victim, but benefitted from what the facilitator should have known was a trafficking venture."[56]

### 1.      Elements of the civil remedy under section 1595.

A.B. alleges Marriott is liable to her under section 1595 for knowingly benefitting from facilitating a venture it knew or should have known engaged in sex trafficking in violation of section 1591(a).[57]

Section 1591 of the Act imposes criminal liability for sex trafficking of children, or of any person by force, fraud, or coercion, to engage in a commercial sex act.  Section 1591(a) provides: "[w]hoever knowingly – (1) in or affecting interstate or foreign commerce, … recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, … in reckless disregard of the fact, that means of force, threats of force, fraud, coercion …, or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b)."[58]  As used in section 1591, the term "participation in a venture" means "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)."[59]

9

Section 1595 provides a civil remedy to victims of sex trafficking: "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person *knew or should have known* has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees."[60]  "The phrase 'knew or should have known,' echoes common language used in describing an objective standard of negligence."[61]

To state a claim under a section 1595(a) beneficiary theory, A.B. must allege facts beyond mere conclusions allowing us to plausibly infer Marriott (1) "knowingly benefit[ted] financially or by receiving anything of value"; (2) from participation in a venture; (3) it "knew or should have known has engaged in" sex trafficking under section 1591.[62]

Marriott argues A.B. fails to allege (1) it "knew or should have known" about A.B.'s sex trafficking; (2) "knowingly" benefitted from a sex trafficking venture; and (3) its "participation" in a sex trafficking "venture."  It also argues A.B.'s lawyer relies on "cookie-cutter" allegations taken from pleadings of unrelated litigation and otherwise filed a "shotgun" pleading non-compliant with Federal Rule of Civil Procedure 8(a).

Although Marriott argues A.B. failed to allege all three elements of a section 1595(a) claim, the heart of its argument is it did not knowingly participate in a sex trafficking venture.  Applying the criminal standard from section 1591, Marriott argues the dispositive question is whether it made an "overt act of participation in the sex trafficking."  It argues there is no allegation Marriott committed an overt act in furtherance of a sex trafficking venture and A.B. does not, and cannot, in good faith, allege Marriott shared a common purpose with her traffickers.  Marriott argues A.B.'s construction of section 1595 turns the Act on its head by "creating liability for any business

which fails to affirmatively prevent sex trafficking by third party criminals, instead of applying the actual words of the statute, which impose liability on those who knowingly participate in a trafficking venture with such criminals."[63]

Although A.B.'s amended complaint is not a model of clarity, we do not view it as an attempt to create a new theory of liability on a business failing to affirmatively prevent sex trafficking. We disagree with A.B. to the extent she seeks us to find Congress imposed duties upon businesses to affirmatively prevent sex trafficking on their hotel properties as businesses who financially benefit from trafficking through room rentals. We do not read the Act as requiring hotels (and other businesses or professions possibly earning money from trafficking) to affirmatively stop the trafficking. We construe the Act under its terms as imposing liability should a jury find the business benefitted from participating in a venture it knew or should have known engaged in trafficking. Given their physical proximity as the venue for the trafficking, hotels uniquely may have more knowledge than car rental or airplane businesses, or even lawyers or accountants, who may be paid from the trafficking proceeds. Rather than reading her claims as seeking to impose a duty to prevent trafficking, we read A.B.'s amended complaint as seeking the civil remedy Congress gave victims of sex trafficking against "whoever knowingly benefits" from participation in a venture the person "knew or should have known engaged" in a violation of the Act. And although A.B. broadly alleges sex trafficking in the hotel industry in general, and instances of trafficking in other hotels having nothing to do with her, A.B.'s allegations at paragraphs 80-107 are more than sufficient to meet the requirements of Rule 12(b)(6) and Rule (8).

### 2.  Split in district courts addressing section 1595 civil remedy.

The parties do not provide us with, and we cannot find, a case from our Court of Appeals or a district court within this Circuit addressing the Act.  Of the twenty-one cases submitted to the Judicial Panel for Multidistrict Litigation, three cases from the United States District Court for the Southern District of Ohio, and one case from the United States District Court for the Western District of Washington denied motions to dismiss by the hotel defendants[64] and four cases from the United States District Court for the Northern District of Georgia granted motions to dismiss without prejudice by the hotel defendants.[65]  In the remaining cases, the defendant hotels either answered or motions to dismiss are pending.[66]

We see the disconnect here arising from two schools of thought thus far in section 1595 cases involving hotel liability; one adopted by the United States District Court for the Southern District of Ohio and the United States District Court for the Western District of Washington, and the other by the United States District Court for the Northern District of Georgia.  A.B. relies on the cases from the Southern District of Ohio.  Marriott relies on cases from the Northern District of Georgia.  It argues, inaccurately we think, the cases from the Southern District of Ohio are "outliers" and "contrary to the weight of authority."  Given the limited number of opinions to date, we cannot consider either theory to be an "outlier" or the majority view.  After extensive analysis below, we disagree with Marriott's analysis.  Like the United States District Court for the Southern District of Ohio, we interpret section 1595 as distinct from section 1591's criminal liability.

### Cases from the United States District Courts for the Southern District of Ohio and the Western District of Washington.

The Honorable Algenon L. Marbley, United States District Court for the Southern District of Ohio, addressed claims against corporate franchisor hotels under section 1595 with allegations

like A.B.[67]   In all three actions, plaintiff victims of sex trafficking sued defendant hotels under section 1595.  Judge Marbley denied the defendant hotels' motions to dismiss.

We examine one case, *M.A. v. Wyndham Hotels & Resorts, Inc.*, as an exemplar of Judge Marbley's reasoning.  In *M.A.*, plaintiff alleged victimization from sex trafficking at Days Inn by Wyndham, Comfort Inn, and Crowne Plaza locations in Columbus, Ohio.  Like A.B., plaintiff M.A. alleged hotel defendants knew or should have known of her trafficking on their properties pointing to signs of trafficking including her trafficker asked for rooms near exits; rooms in which her trafficking occurred contained used condoms and other paraphernalia; rooms were paid for in cash; her physical deterioration such as bruising hotel staff observed or should have observed; no eye contact; long stays in the hotel; and cries for help ignored by hotel staff.[68]

The hotel defendants moved to dismiss the section 1595 claim arguing M.A. failed to plead (1) a knowing benefit; (2) knew or should have known of a trafficking venture; and (3) participation in a venture.  On the first element, hotel defendants argued receiving revenue from renting hotel rooms is not a benefit.  Judge Marbley denied the objection, concluding M.A.'s allegation hotel defendants rented rooms to the trafficker is a financial benefit from a relationship with the trafficker sufficient to meet section 1595(a).[69]

Moving to the "knew or should have known" of a sex trafficking venture element, Judge Marbley provided an instructive example of two ends of the spectrum for pleading civil liability based on a sex trafficking venture.  On one end is *Riccio v. McLean*[70] where plaintiff alleged a sex trafficker worked with a hotel owner intending to profit from the venture, including allegations the hotel owner and sex trafficker "high-fived" each other in anticipation of the venture and the hotel owner witnessed plaintiff's abuse at the hands of her trafficker.[71]  On the other end of the spectrum is *Lawson v. Rubin*[72] where plaintiff sued an owner who leased its condominium to defendant who

procured women, including plaintiff, and sexually assaulted and abused them.  Plaintiff alleged

one visit by the police department and one visit by an ambulance to the condominium unit in over

six years should have put the owner on notice of illegal activity.  Judge Marbley found these two

visits insufficient to plausibly infer knowledge or negligence necessary to state a claim for liability

under section 1595 of the Act.[73]

Judge Marbley found M.A.'s allegations somewhere in between these two ends.[74]  He

found the alleged sex trafficking signs are insufficient to show actual knowledge but are sufficient

to meet the "should have known" negligence standard.[75]

On the "participation in a venture" element, Judge Marbley rejected the hotel defendants'

reliance, as Marriott does here, on *United States v. Afyare*, a 2016 criminal prosecution addressed

by the United States Court of Appeals for the Sixth Circuit.[76]  In *Afyare*, prosecutors charged

defendants in an alleged sex trafficking ring including conspiracy to benefit financially from a

venture to sex traffic minor victims under section 1591(a)(2).  The district court determined the

word "venture" as used in section 1591(a)(2) means "sex trafficking venture," and the court

excluded evidence of non-sex trafficking ventures and instructed the jury accordingly. The jury

acquitted some defendants but convicted others on some charges.  The district court then acquitted

the convicted defendants because it found prosecutors charged a single conspiracy but presented

evidence of multiple conspiracies causing prejudice to the defendants.[77] The United States

appealed challenging, *inter alia*, the district court's holding a "venture" in section 1591(a)(2)

means only a "sex trafficking venture" and not just any venture.

The Court of Appeals affirmed the district court.  It found the term "venture" in the context

of section 1591(a)(2) specifies "'a venture which has engaged in an act described in violation of

paragraph (1),' i.e., sex trafficking" and "most important[ly], … requires the defendant's personal

knowledge (or reckless disregard) that this venture (or someone within the venture) caused … or used force, fraud, or coercion to cause an adult to engage in a commercial sex act.  The defendant's mere membership in the venture is insufficient if he is ignorant of the venture's sex trafficking activities (and the means and methods thereof).  That is, the government does not argue guilt by association, nor could it."[78]  The court of appeals agreed with the district court's analysis section 1591(a)(2) requires "a defendant actually participate and commit some 'overt act' that furthers the sex trafficking aspect of the venture" and the Act "did not criminalize a defendant's 'mere negative acquiescence,' and to do so would create 'a vehicle to ensnare conduct that the statute never contemplated."[79]

Judge Marbley declined to apply *Afyare* for two reasons: the language of the Act and principles of statutory construction.  He first reasoned the language of sections 1591 and 1595 differ; section 1595 contains the "should have known" language while section 1591 does not. Section 1591(e)(4) defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)," and is limited in application only to "this section," meaning section 1591. Section 1595 does not define "participation in a venture."[80]  Judge Marbley concluded applying the definition of "participation in a venture" to the criminal liability in section 1591(e)(4) to the civil liability in section 1595 voids the "should have known" language in the civil remedy and violates the "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be construed so that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"[81]

Rejecting *Afyare*'s reasoning and concluding "participation" under section 1595 does not require actual knowledge of participation in sex trafficking itself, Judge Marbley then considered whether M.A.'s complaint alleged "participation in a venture."  He found allegations the hotel

defendants "engag[ed] in acts and omissions that were intended to support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of the Plaintiff for commercial sexual exploitation" including repeated rental of rooms it knew or should have known to sex traffickers, sufficient to state a claim.[82]   He found "[i]n the absence of a direct association, Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement."[83]

Judge Marbley rejected the hotels' argument they cannot be held liable as a matter of law for the acts of their franchisee hotels, finding M.A. pleaded an agency relationship sufficient to hold the franchisor hotels liable under Ohio law.[84]

Magistrate Judge Theresa L. Fricke, United States District Court for the Western District of Washington, last week recommended the denial of the motion to dismiss by Wyndham Hotel & Resorts, Inc.[85]   There, plaintiff M.L. brought a claim against Wyndham under section 1595 alleging she is a victim of sex trafficking by her traffickers who harbored her at a Wyndham owned hotel in Kent, Washington.  Plaintiff  M.L. alleged at the age of sixteen and seventeen years old, traffickers held her at the hotel for over one year; advertised her services for commercial sex at the hotel; paid Wyndham and the limited liability corporation operating the local hotel for the rental of rooms; purchasers arrived at the hotel and waited in parking lots, common areas, and hallways of the hotel; hotel staff were aware of trafficking given the large number of men waiting to enter the room; the large number of condoms in trash cans and other paraphernalia; staff spoke to M.L. on more than one occasion and warned her to keep her activities more discrete; and police called the hotel to speak to staff regarding M.L. M.L. alleged Wyndham was aware of trafficking

occurring at its hotels because it received complaints and concerns from the public and law enforcement.[86]  Plaintiff alleged Wyndham had an agency relationship with the local hotel.

Wyndham moved to dismiss arguing the complaint relies on "shotgun pleading" and fails to state a claim under section 1595.  Magistrate Judge Fricke rejected both arguments.  Examining the section 1595 claim, Judge Fricke relied on Judge Marbley's opinions and, following his two ends of the spectrum example, found the plaintiff's complaint more like *Riccio v. McLean*.[87]  Judge Fricke rejected Wyndham's reliance on *Afyare* and cases from the United States District Court for the Southern District of New York (described below).[88]  Judge Fricke rejected those cases as relying on the criminal standard in section 1591 which is not imposed in section 1595.

### Cases from the United States District Court for the Northern District of Georgia.

Decisions in the last few days from the United States District Court for the Northern District of Georgia, take a largely opposite view.  In four cases brought by Jane Doe victims of sex trafficking against Red Roof Inns in the Atlanta area, the district court judge granted the hotel defendants' motions to dismiss claims under section 1595.[89]

The district court judge recognized the Jane Doe victims brought three claims under the Act against the franchisor/corporate affiliate hotels: a "standalone" claim under section 1595(a) and two claims on alleged criminal violations of Sections 1591(a)(1) and 1591(a)(2).[90]  While recognizing a "standalone" claim under section 1595, the court identified the elements the victim must allege under the Act: "Defendants participated in ventures that were engaged in sex trafficking and that they each had three separate types of knowledge with respect to that venture: (1) knowledge as to a benefit received from trafficking; (2) knowledge as to "assisting, supporting or facilitating" trafficking; and (3) knowledge that Plaintiff was either a minor or subject to

17

force."[91]   In doing so, the court imposed the definition of "participation in a venture" in section 1591(e)(4) and the standards of section 1591(a)(2) to claims brought under section 1595.

Finding "[a]ssociation alone cannot establish liability; instead, knowledge and 'some participation in the sex trafficking act itself must be shown," the court concluded plaintiffs failed to plead facts sufficient to plausibly allege defendant franchisor/corporate affiliate hotels knew or should have known of sex trafficking at local franchisee hotels.[92]

The district court judge in Atlanta in the Red Roof cases relied on *Nobel v. Weinstein*[93] from the United States District Court for the Southern District of New York involving claims against Harvey Weinstein and *Afyare*.  In *Noble*, plaintiff sued Harvey Weinstein and his brother Robert Weinstein for sexual assault allegedly committed against her by Harvey Weinstein in 2014. Plaintiff brought a civil action under section 1595 for violations of section 1591.  Both Harvey and Robert Weinstein moved to dismiss the claims.  The court denied Harvey Weinstein's motion, but granted Robert Weinstein's motion.

Marriott, like the judge in the Northern District of Georgia, relies exclusively on *Noble* which, in turn, relied on the criminal liability analysis applied in *Afyare*.  We are interested here in the analysis employed by the court in *Noble* with respect to the alleged trafficker's brother, Robert Weinstein.  Plaintiff alleged Robert Weinstein violated section 1591(a)(2) because he benefitted from, and knowingly facilitated, Harvey Weinstein's violation of section 1591(a). Focusing on the "participation in a venture" element in section 1591(a)(2)—the criminal section— the court found Plaintiff must plead Robert Weinstein "(i) knowingly benefitted, (ii) from participation in a commercial sex trafficking venture, (iii) while knowing (or in reckless disregard of the fact) that means of force, fraud or coercion would be used to cause the trafficked person to engage in a commercial sex act."[94]  Relying on *Afyare*—which, again analyzed the participation

18

element in a criminal prosecution—the court in *Noble* found liability "cannot be established by association alone [and] Plaintiff must allege specific conduct that furthered the sex trafficking venture. Such conduct must have been undertaken with the knowledge, or in reckless disregard of the fact, that it was furthering the alleged sex trafficking venture.  In other words, some participation in the sex trafficking act itself must be shown."[95] The court in *Noble* found plaintiff must allege facts implicating Robert Weinstein as a participant in Harvey Weinstein's 2014 assault and "without participation, there can be no violation of Section 1591(a)(2)."[96]

Neither the court in *Noble* nor the court in Atlanta applied an "overt act" requirement advocated by Marriott here.  This undercuts Marriott's argument it must have committed an "overt act" to have participated in a venture it knew or should have known engaged in sex trafficking.

The court in *Noble* and in the Red Roof cases in Atlanta both applied the "participation in a venture" element from the criminal offense defined by Congress in section 1591(a)(2).  The court in *Noble* did not address the "knew or should have known" language in the civil remedies defined in section 1595.  Both the court in the Red Roof cases and the court in *Noble* essentially required the victim of sex trafficking seeking a civil remedy to first prove a criminal violation of section 1591(a)(2).   And this is where we diverge from the judges in the Northern District of Georgia in the Red Roof cases and the Southern District of New York in *Noble*.

> ### 3.    Congress allows potential liability for businesses who "should have known" of trafficking under section 1595's civil remedy.

We disagree with the reasoning in *Noble*, adopted by the judge in the Red Roof cases, requiring a victim seeking a civil remedy under section 1595 must first prove the criminal offense. We do not read the language of section 1595 to impose such a burden nor do we interpret the Act as Congress intended such a restrictive reading of the remedial nature of section 1595.

19

Section 1595(a), by its terms, provides a civil remedy to a victim of, *inter alia*, sex trafficking. The victim may bring a civil action to recover damages and attorney's fees from (1) her trafficker or (2) "***whoever*** knowingly benefits … from participation in a venture what that person ***knew or should have known*** has engaged in" a sex trafficking venture. The definition of "participation in a venture" by its terms applies only to the criminal offense in section 1591(a). This requires "knowing" or "reckless disregard" of a sex trafficking venture. If we imputed this standard into section 1595—which does ***not*** define "participation in a venture"—we would ignore its "knew or should have known" language. Section 1591, in contrast, defines a criminal violation requires knowing conduct consistent with the Supreme Court's continued reminders (albeit in other contexts) of knowledge necessary for a criminal act.[97]

Section 1595 allows for civil liability against facilitators who benefit from what they knew or should have known is a sex trafficking venture. As a remedial statute, we construe the Act liberally.[98] Where, as here, a statute is "remedial," it "should be liberally construed." We cannot read out the language of section 1595 imposing civil liability against a person who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or ***should have known*** has engaged in an act in violation of this chapter." We will not impose a "knowingly" state of mind requirement to section 1595 and ignore language Congress specifically included allowing a civil action against facilitators who should have known about a sex trafficking venture.

### B.     A.B. pleads a claim for a civil remedy under section 1595.

To state a claim under a section 1595(a) beneficiary theory, A.B. must allege facts from which we can reasonably infer Marriott (1) "knowingly benefit[ted] financially or by receiving anything of value"; (2) from participation in a venture; (3) it "knew or should have known has

engaged in" sex trafficking under section 1591.[99]  Marriott argues A.B. failed to allege facts to support the three elements.

As to her trafficking specifically, A.B. alleges:

- Between 2009-2011, A.B.'s traffickers used Marriott's three Philadelphia Airport hotels to sell illegal sex acts;

- As many as six men an evening entered each of the three hotels as an "unannounced guest," creating a "voluminous and obvious" constant stream of male visitors to A.B.'s rooms accessed through the front door and main lobby of the hotels;

- A.B.'s trafficker repeatedly paid for rooms at each of the three hotels for at least a week at a time with prepaid credit cards and hotel staff were aware of A.B.;

- When A.B.'s trafficker brought her to the hotels, she presented with little, if any, luggage, no phone, wallet, or identification, and when checking A.B. into the hotel, he would not proceed to the room;

- Rooms rented for trafficking were littered with multiple broken objects, used condoms, and other sex paraphernalia which would have been noticed by staff;

- Staff at all three hotels observed A.B. with signs of visible injury on more than one occasion, frequent loud altercations, and attacks on A.B. by her trafficker were constant and loud enough for hotel patrons and staff to hear.[100]

A.B. sufficiently alleges the elements of a claim under section 1595 against Marriott's franchisee Philadelphia Airport hotels.  In the next section we determine whether the franchisee hotels' constructive knowledge is plausibly imputed to Marriott based on an agency theory.

### *Knowingly benefits financially.*

To satisfy the first element, A.B. must plausibly allege the Marriott "knowingly benefit[ted] financially or by receiving anything of value" from the trafficking venture.  Marriott concedes A.B. alleges Marriott knowingly benefitted from the trafficking venture through payments made by the trafficker for rooms in the three Philadelphia Airport hotels but argues this is a "conclusory label."  Marriott argues there are no facts from which Marriott, as an admitted

franchisor receiving a royalty from the overall revenues of a franchised hotel, "had any reason to suspect that the rooms were used to commit sex trafficking crimes …."[101]  Marriott contends the collection of rent "by an unrelated hotel manager from guests in the ordinary course of business cannot support a reasonable inference that a franchisor such as Marriott … 'knowingly' benefited from crimes committed in those rooms."

Marriott cites *Canosa v. Ziff*, a case from the United States District Court for the Southern District of New York and which relies on *Noble*. [102]  We disagree *Canosa* supports Marriott's argument.  In *Canosa*, the plaintiff sued Harvey Weinstein, his brother Robert Weinstein, and companies run by the Weinsteins for damages under the Act.  Robert Weinstein and the Weinstein companies moved to dismiss the section 1595 claims arguing they did not participate in and knowingly benefit from a sex trafficking venture.[103]

The court rejected the Weinstein companies' argument.  With respect to the knowingly benefitted element, the court found plaintiff alleged "by facilitating and covering up [Harvey] Weinstein's sexual assaults, [Weinstein companies] made Weinstein more likely to continue to work for [Weinstein companies]. While the facts developed in discovery may or may not substantiate this allegation, the [amended complaint] adequately pleads a symbiotic relationship between the [Weinstein companies] and [Harvey] Weinstein, in which the companies affirmatively enabled and concealed [Harvey] Weinstein's predations as a means of keeping him happy, productive, and employable which led the companies to achieve fame and reap financial benefits. … The [Weinstein companies'] claim that there is no causal link between their acts and practices and [Harvey] Weinstein's sexual abuse of women, including [Plaintiff], is thus unpersuasive."[104]

A.B. alleged during the years of her trafficking at the three Marriott hotels (2009-2011), her trafficker rented rooms for weeks at a time, paid with a prepaid credit card, checked her in with

little personal belongings, a steady stream of male visitors entered the hotel through the front doors and main lobby, and the rooms bore signs of illicit sexual activity.[105]  A.B. alleges Marriott knew or should have known of these "red flags" but nevertheless continued to rent rooms to A.B.'s traffickers and received financial benefit from sex trafficking by "develop[ing] and maintain[ing] business models that attract and foster the commercial sex market for traffickers and buyers alike"; "enjoys the steady stream of income that sex traffickers bring to their hotels"; "financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex"; and received "payment for rooms."[106]  "[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard."[107]

While these allegations may ultimately be proven untrue or unsupported by evidence, the allegations at the motion to dismiss stage are sufficient to meet the "knowingly benefitted" element of a civil claim under section 1595 of the Act.

### *Participation in a venture.*

Marriott argues A.B. fails to allege it participated in a sex trafficking venture.  Section 1591(a)(2) imposing criminal liability on "whoever knowingly … benefits, financially or by receiving anything of value, from ***participation in a venture*** which has engaged in an act described in violation of paragraph (1)."[108]

Marriott relies primarily on *Afyare*, a case we already distinguished and disagree applies in the civil context where we may focus on whether the business should have known of the conduct. Marriott argues we should apply *Afyare* and dismiss A.B.'s amended complaint because there are no allegations Marriott "had any association with a 'sex trafficking venture'" or "committed any overt act in furtherance of that sex trafficking venture."  Marriott argues "district courts" recently confirmed "these same principles" apply to civil liability under section 1595 of the Act, citing

*Noble* and another case from the United States District Court for the Southern District of New York, *Geiss v. Weinstein Co. Holdings, LLC.* [109]

We analyzed *Noble* and explained why we disagree with its reasoning applying the criminal standard of section 1591 to the civil remedy of section 1595.  *Geiss* applied *Noble* and reached a similar result.  In *Geiss*, plaintiffs brought claims against Harvey Weinstein and his companies under section 1595.  The court, citing *Afyare*, held "the participation giving rise to the benefit must be participation in a sex-trafficking venture, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture." [110]  Marriott cites this passage from *Geiss* to argue A.B. fails to allege Marriott participated in a sex trafficking venture.

But *Geiss* is entirely distinguishable other than citing section 1595.  The court recognized under the 2008 amendment of section 1595 "victims may bring an action against a 'perpetrator' or against 'whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in' a qualifying offense." [111]  Then, in a footnote, the court recognized "[t]he previous version of the statute, enacted in 2003, provided a civil action against only the 'perpetrator' of a qualifying offense.  However, a 'perpetrator can be either a direct violator under 18 U.S.C. § 1591(a)(1), or a participant under 18 U.S.C. § 1591(a)(2), neither of which provisions have changed in any relevant way since 2003.  The 2008 Amendment also introduces the 'should have known' language in the civil liability provision, thereby adding a constructive knowledge alternative to the existing actual knowledge standard. ***Since this opinion assumes defendants' actual knowledge of a sex trafficking enterprise, whether the 2003 or 2008 version of the TVPA applies to a given claim is irrelevant***." [112]

The court in *Geiss* assumed both Harvey Weinstein's and his companies' actual knowledge and did not apply a "should have known" analysis.  It assumed the plaintiffs sought to enforce, through section 1595, liability against the perpetrators of trafficking and did not examine liability for a person who knowingly benefits from participation in a venture it ***knew or should have known*** engaged in trafficking.  The court in *Geiss* did not apply constructive knowledge as A.B. alleges.  Thus, *Geiss* is inapposite, distinguishable, and not persuasive.

Marriott argues we must apply *Afyare*, *Noble*, and *Geiss* as applied by the Southern District of New York.  A.B. argues we should follow the hotel cases from the Southern District of Ohio.  As explained, we are persuaded the clear language of section 1595 favors the approach taken by Judge Marbley focusing on a hotel's possible civil liability best conforms to Congress's intent in amending the Act to include a civil remedy provision, at least as applied to a hotel where there is a direct connection between a rental fee for the room where the trafficking is effected.[113]

### "Knew or should have known" of a sex trafficking venture.

Marriott argues A.B. pleads the "knew or should have known" element of the Act based only on the hospitality industry's complicity in sex trafficking.  It cites three cases to support its argument "as a matter of law" allegations regarding the general hotel industry cannot support a plausible inference Marriott knew or should have known about A.B.'s sex trafficking.[114]  We disagree with Marriott for two reasons: its cited cases are distinguishable, and A.B. sufficiently alleges facts Marriott's three Philadelphia Airport hotels knew or should have known about A.B.'s trafficking.

The district courts in both *Ratha* and *Misko* applied summary judgment standards with the benefit of discovery, not at the motion to dismiss stage.  In those cases, the court entered summary judgment in favor of the defendant because the ***evidence*** under the Rule 56 standard did not support

plaintiffs' claims.  We are not addressing a motion for summary judgment.  The third case, decided on a motion to dismiss, is also distinguishable.[115]  The *Florida Abolitionist* complaint failed to allege the defendant website advertising "adult services" saw an advertisement and knew it related to illegal sex trafficking.[116]  As analyzed below, A.B. alleges conduct specifically relating to her.

We disagree with Marriott regarding A.B.'s specificity.  Marriott argues A.B. alleges only general conduct in the hotel industry regarding sex trafficking imposes liability on Marriott.  It is true A.B.'s amended complaint inartfully includes numerous allegations regarding the problem of sex trafficking generally, the use of hotel and motel rooms as a venue for trafficking, efforts by private organizations and the Department of Homeland Security to combat human trafficking, and news reports on sex trafficking incidents involving other victims and other hotels.  If A.B. made only these allegations, we may agree with Marriott.  But A.B. also specifically alleges A.B.'s trafficking in and through three identified Marriott branded hotels.  At this preliminary stage, we read A.B.'s allegations regarding the hospitality industry generally as background and supporting A.B.'s allegation Marriott, along with other hotel brands, knew about the problem of sex trafficking.  We draw all reasonable inferences from A.B.'s amended complaint on a motion to dismiss: between 2009-2011, A.B.'s traffickers used Marriott's three Philadelphia Airport hotels to sell illegal sex acts; as many as six men an evening entered each of the three hotels as an "unannounced guest," creating a "voluminous and obvious" constant stream of male visitors to A.B.'s rooms accessed through the front door and main lobby of the hotels; A.B.'s trafficker repeatedly paid for rooms at each of the three hotels for at least a week at a time with prepaid credit cards and hotel staff were aware of A.B.; when A.B.'s trafficker brought her to the hotels, she presented with little, if any, luggage, no phone, wallet, or identification, and when checking A.B. into the hotel, he would not proceed to the room; rooms rented for trafficking were littered with

multiple broken objects, used condoms, and other sex paraphernalia which would have been noticed by staff; and staff at all three hotels observed A.B. with signs of visible injury on more than one occasion, frequent loud altercations, and attacks on A.B. by her trafficker were constant and loud enough for hotel patrons and staff to hear.[117]

We find these allegations plausibly allege Marriott knew or should have known of a sex trafficking venture involving A.B. at its three Philadelphia Airport hotels.  We can fairly infer hotel employees accepted the money from the trafficker who did not check into the room.  Hotel staff knew of A.B.  She appeared at the hotels with little, if any, luggage, no phone, wallet, or identification.  Hotel employees cleaned up the rooms with multiple broken objects and paraphernalia.  A.B. entered all three hotels with visible injury.  A.B. alleges Marriott knew of the problem of sex trafficking in its and other hotels, Marriott failed to take steps to implement staff training and other preventative measures, and, as to A.B. herself, failed to act on signs of sex trafficking in each of its three Philadelphia Airport hotels between 2009 and 2011.  At this stage, we can readily interpret A.B. as pleading Marriott should have known of a sex trafficking venture at the three airport hotels.  Unlike a one-time visit, A.B.'s pleaded return visits with similar characteristics also allow us to infer Marriott knew of the sexual trafficking in A.B.'s prepaid hotel room.

As detailed above, A.B. pleads staff at Marriott's Philadelphia Airport hotels should have known about her sex trafficking.  A.B. plausibly states a claim against Marriott under section 1595. For the same reasons, we deny Marriott's objection the amended complaint is a "shotgun" pleading violating Rule 8(a).[118]  While A.B. includes general allegations regarding the hospitality industry generally, we listed the allegations specific to her trafficking.  These allegations specific to her stays

at the three Marriott airport hotels are sufficient to put Marriott on notice of the claims against it. We deny Marriott's motion to dismiss.

Through discovery, Marriott may be able to adduce alternative plausible explanations from which a jury could find it had no actual or constructive knowledge. But A.B. sufficiently pleads repeated similar conduct in the three specific Marriott hotels. While we may consider dismissing more general shotgun allegations or theories based on an infrequent exposure to these common characteristics, A.B. sufficiently plead Marriott knew or should have known under the civil liability portion of the Act.

### C.     A.B. plausibly pleads a principal-agent relationship for vicarious liability but fails to plead an apparent authority relationship to hold Marriott liable.

Marriott next argues A.B. fails to allege it is vicariously liable for the acts or omissions of the staff at its franchisee hotels because, as a matter of Pennsylvania law, a franchisee relationship does not necessarily imply a principal-agent relationship. Marriott argues a principal-agent relationship is only established when the franchisor exercises day-to-day control over the franchisee and A.B. failed to allege facts allowing us to plausibly infer Marriott had a right to control day-to-day operations of its three franchisee airport hotels. Marriott also argues A.B. fails to allege facts to support an apparent agency theory of vicarious liability under Pennsylvania law.

A.B. responds it need not show a principal-agent relationship because Marriott is directly liable for facilitating sex trafficking under section 1595. Although asserting a direct liability theory against Marriott under section 1595 of the Act, A.B. argues Marriott is also liable under a principal-agent theory. And, although she pleads an apparent agency relationship between Marriott and the three Philadelphia Airport hotels,[119] A.B. does not respond to Marriott's argument she fails to allege facts supporting an apparent agency theory of liability.

1.       **A.B. plausibly pleads a principal-agent relationship.**

Under Pennsylvania law, "not every relationship of principal and agent creates vicarious responsibility in the principal for acts of the agent."[120]  "A principal and agent can be in the relationship of a master and servant, or simply in the status of two independent contractors."[121] The "mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship."[122]

To hold Marriott International vicariously liable for the conduct of its franchisee hotels, there must be a master-servant relationship determined by the Pennsylvania Supreme Court's test: "whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged … The hallmark of an employee-employer relationship is that the employer not only controls the result of the work *but has the right to direct the manner in which the work shall be accomplished*; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result."[123]

The key focus on whether there is a master-servant relationship is the right to control the way the servant's work is accomplished.  Under Pennsylvania law this means the focus of the inquiry "should be whether the alleged master has day-to-day control over the manner of the alleged servant's performance."[124]

Marriott relies heavily on the Pennsylvania Superior Court's reasoning in *Myszkowksi v. Penn Stroud Hotel, Inc.*  As a threshold matter, the trial court decided *Myszkowski* on a developed summary judgment record and, as such, is not the proper standard on a motion to dismiss. *Myszkowski* is distinguishable on its merits.  Plaintiff sued Best Western and Penn Stroud Hotel

for injuries sustained in a sexual assault in the ladies' room of the hotel.  Plaintiff alleged Best Western failed to provide adequate security.[125]  The trial court entered summary judgment in favor of Best Western.

On appeal, the Pennsylvania Superior Court examined whether Best Western had an actual agency relationship or an apparent agency relationship with Penn Stroud which had a marketing agreement with Best Western and a member of the Best Western organization allowing it to use the "Best Western" name and participate in its reservation network.[126]  The court concluded the evidence did not show Best Western exercised day-to-day control over the Penn Stroud Hotel; the owners of Penn Stroud Hotel hired and fired employees, made all business decisions, set the prices for hotel accommodations, and the agreement between the entities showed Penn Stroud as an independent contractor.[127]

Marriott argues *Myszkowski* compels a finding there is no actual agency relationship between it and the Philadelphia Airport hotels.  Marriott recognizes A.B. alleges it controls its franchisee hotels,[128] but argues she fails to allege facts showing it has control over the day-to-day operations.  We disagree.  A.B. alleges Marriott exercises "ongoing and systemic right of control over" its franchisee hotels including the "means and methods of how [its franchisee hotels] conduct *daily* business" including sharing profits, standardized training methods for employees, building and maintaining the facility in a manner specified by Marriott International; regular inspection of the facility and operation by Marriott; and fixing prices.[129]

The evidence may ultimately prove Marriott does not exercise day-to-day control over its Philadelphia Airport hotels, but this is more properly raised after discovery.  We deny Marriott's motion to dismiss on a principal-agent theory of liability.

### 2.      A.B.'s does not plead an apparent agency theory.

Marriott argues A.B. fails to allege facts to support an apparent agency theory of vicarious liability, and the facts as alleged cut against an apparent agency theory.  Marriott argues A.B. alleges her traffickers held her against her will at the three hotels which is "incompatible with the notion … A.B. somehow 'relied' on a representation by Marriott."[130]  A.B. does not address this argument in her response.

Section 257 of the Restatement (Second) of Agency provides: "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill or such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."[131]  Under Pennsylvania law, a principal may be liable to another for the acts of its agent based on "apparent authority or agency by estoppel."[132]  Two elements are required to establish apparent authority or agency by estoppel: "(1) there must be negligence on the part of the principal in failing to correct the belief of the third party concerning the agent; and (2) there must be justifiable reliance by the third party."[133]

We agree with Marriott.  Under *Myszkowski*, an apparent agency theory is not applicable here as a matter of law.  "Both apparent authority and agency by estoppel are 'customarily [only] relevant in the context of business transactions.'"[134]  The Pennsylvania Superior Court affirmed the trial court's entry of summary judgment on an apparent agency theory because the plaintiff's claim "is one in tort for the alleged negligence which resulted in the sexual assault of appellant. Under the facts of this case, we fail to see how appellant can be said to have relied upon the apparent authority of Penn Stroud to avoid being the victim of this random act of violence. Our review of the record indicates that appellant has presented no evidence which even remotely

supports her allegation that she *relied* upon the fact that Penn Stroud represented Best Western, as its agent, on the night she was sexually assaulted."[135]

A.B. fails to allege the elements of an apparent authority and, given the facts as alleged, we do not see how she relied on any representation (which is not alleged) by Marriott regarding its franchisee hotels somehow caused her injury.  To the extent she can adduce facts in discovery, she may move to timely amend if necessary.

> **D.     A.B.'s claim under Pennsylvania law is time-barred and fails to state a claim.**

Marriott moves to dismiss A.B.'s claim under Pennsylvania's human trafficking statute, 18 Pa. Cons. Stat. § 3051, for three reasons: (1) the statute's safe harbor provision  expressly exempts Marriott International from civil liability; (2) even without the safe harbor provision, A.B. fails to state a claim; and (3) the claim is time-barred by the applicable five-year statute of limitations. We agree with Marriott and dismiss the Pennsylvania trafficking claim without prejudice for A.B. to move to amend with the benefit of more facts to possibly state a claim under Pennsylvania's statute and if possible under Federal Rule of Civil Procedure 11.

Under Pennsylvania's trafficking statute, it is a felony for a person who (1) "recruits, entices, solicits, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to sexual servitude;" or (2) "knowingly benefits financially or receives anything of value from any act that facilitates any activity described in paragraph (1); …"[136]

Pennsylvania's human trafficking statute provides a civil remedy to victims of "human trafficking" and "the sex trade": "(1) An individual who is a victim of human trafficking may bring a civil action against any person that participated in the human trafficking of the individual in the court of common pleas of the county where the individual resides or where any of the alleged

violations of this chapter occurred. (2)  An individual who is a victim of the sex trade may bring a civil action in the court of common pleas of the county where the individual resides against a person that: (i) recruits, profits from or maintains the victim in any sex trade act; (ii) abuses or causes bodily harm to the victim in any sex trade act; and (iii) knowingly advertises or publishes advertisements for purposes of recruitment into sex trade activity."[137]

The parties do not cite, and we did not find, a case from the Pennsylvania courts or federal courts in Pennsylvania construing section 3051 of the human trafficking statute, including the definition of "participation" in human trafficking.  "Human trafficking" is defined by the statute as "[a]ny activity in violation of section 3011 (relating to trafficking in individuals) either alone or in conjunction with an activity in violation of section 3012 (relating to involuntary servitude)."[138] Section 3011, as noted above, imposes criminal liability on a person who, *inter alia*, (1) "recruits, entices, solicits, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to sexual servitude;" or (2) "knowingly benefits financially or receives anything of value from any act that facilitates any activity described in paragraph (1)."[139]  Section 3012 imposes criminal liability upon a person who "knowingly … subjects an individual to labor servitude or sexual servitude, except where the conduct is permissible under Federal or State law other than this chapter."[140] The Pennsylvania General Assembly did not define the term "sex trade."

Pennsylvania's statute creates an exception, or safe harbor, to civil liability to "any person who provides goods or services to the general public and to a person who would be liable under subsection (a)(2), absent a showing that the person: (1) knowingly markets or provides its goods or services to a person liable under subsection (a)(2); (2) knowingly receives a higher level of

compensation from a person liable under subsection (a)(2); or (3) supervises or exercises control over a person liable under subsection (a)(2)."[141]

### 1.    A.B.'s Pennsylvania trafficking claim is time-barred on its face.

Marriott argues A.B.'s Pennsylvania human trafficking claim is time-barred on its face. Under section 3051(h)(1), "[a]n action may be brought under this section by an individual who was the victim of human trafficking while an adult within five years of the last act against that individual that constitutes an offense under this chapter."[142]

A.B. alleges her trafficking began in 2009 at the age of eighteen.  She alleges her trafficking lasted until 2011.  Assuming the trafficking ended in 2011, A.B. had until 2016 to file a complaint. She did not file a complaint until December 9, 2019, three years after the statute expired.

A.B. concedes the trafficking at Marriott brand hotels ended in 2011 but then argues in her response brief her trafficker moved her into other venues: "through approximately May 2015 out of private residences and other hotels [and] [t]herefore, [she] could not bring a claim until at least May 2015."  There are no such allegations in the amended complaint.  Even if we considered claims of trafficking through May 2015, none of it occurred in Marriott owned hotels.

A.B. argues section 3051(h)(1) "embraces the theory of equitable tolling" by starting the statutory period "the last act against that individual that constitutes an offense under this chapter." She argues equitable tolling applies where a plaintiff "in some extraordinary way has been prevented from asserting her rights."  There are no allegations regarding Marriott after 2011.  There are no allegations in the amended complaint to support an equitable tolling theory.

We grant Marriott's motion to dismiss the Pennsylvania statutory claim as barred by the statute of limitations.  With the benefit of more facts or discovery, A.B. may move to amend to

allege the fact basis for an equitable tolling theory, if possible under Federal Rule of Civil Procedure 11.

> ### 2.    As currently pleaded, A.B. does not show Marriott being outside the safe harbor exception.

Even if timely, A.B. does not plead facts bringing Marriott outside the safe harbor of the Pennsylvania statute.   Marriott argues section 3051(b) creates a "safe harbor" explicitly exempting it from civil liability because it is a provider of goods or services to the general public.   A.B. does not contest Marriott provides "goods or services to the general public" in her response.   She instead responds section 3051(b)'s safe harbor provision does not apply because she alleges Marriott "*knowingly* markets or provides its goods or services to" her sex trafficker who is liable under the statute.   A.B. cites paragraphs 54 and 127 of her amended complaint to support her argument Marriott falls within the "knowingly markets or provides its goods or services" exception.

In paragraph 54, A.B. alleges: "Defendant Marriott knew, as of at least early 2006, that human trafficking was occurring in its hotels and across its brand.   Because of this, Defendant Marriott amended its Human Rights Policy as early as 2006 to require annual review of its policy.   To date the policy merely states 'Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention.'"[143]

In paragraph 127, A.B. alleges: "Marriott's acts, omissions, and commissions, outlined above, constitute a violation of [section 3051].   Specifically, Marriott had a statutory obligation not to benefit financially from a venture it knew was engaged in the sex trade.   At all relevant times, Marriott breached this duty by knowingly participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by its acts, omissions, and commissions."[144]

Neither of these paragraphs contain sufficient facts to allow us to draw a reasonable inference Marriott "knowingly market[ed] or provide[d] its goods or services" to A.B.'s trafficker. There is nothing in paragraph 54 to reasonably infer Marriott "knowingly marketed or provided" its services to A.B.'s trafficker.  Paragraph 127 incorporates allegations of the amended complaint, but those allegations support constructive knowledge not actual knowledge by Marriott.

We agree with Marriott as to A.B. failing to plead it "marketed" its services to the trafficker.  It certainly advertised its branded hotels.  But there is no basis it "knowingly" marketed its hotel rooms to foster human trafficking.   We agree there are no allegations Marriott "knowingly provided" rooms to A.B.'s trafficker. Absent allegations of conduct Marriott "knowingly" provided its rooms to A.B.'s trafficker, we also dismiss on this basis.

Should discovery allow, A.B. may move to amend her complaint to allege facts Marriott "knowingly market[ed] or provide[d] its goods or services" to A.B.'s trafficker, if it is possible under Rule 11, to bring it outside the safe harbor of the Pennsylvania statute.

### 3.      Even without the safe harbor exception, A.B. does not allege Marriott participated in human trafficking.

Marriott next argues even without the statutory safe harbor, A.B.'s claim under Pennsylvania statute fails because there are no facts plausibly showing it "participated in the human trafficking on the individual" or comes within the conduct imposing liability in Section 3051(a)(2).  Marriott argues, for the same reasons it did not "participate" in a sex trafficking venture under the federal Act, it did not "participate" in human trafficking under Pennsylvania's statute.  A.B. does not address this argument, focusing instead on the safe harbor argument.

We agree with Marriott.  As analyzed above, the federal Act's civil liability provision uses "knew or ***should have known***" language imposing a tort-based concepts of negligence.  We have no such language in the Pennsylvania statute.

Section 3051(a)(1) provides a civil remedy to "a victim of human trafficking … against any person that ***participated in the human trafficking*** of the individual in the court of common pleas of the county where the individual resides or where any of the alleged violations of this chapter occurred."[145]  The statute defines "human trafficking" as "[a]ny activity in violation of section 3011 (relating to trafficking in individuals) either alone or in conjunction with an activity in violation of section 3012 (relating to involuntary servitude)."[146] Again, section 3011 imposes criminal liability on a person who, *inter alia*, (1) "recruits, entices, solicits, advertises, harbors, transports, provides, obtains or maintains an individual ***if the person knows or recklessly disregards*** that the individual will be subject to sexual servitude;" or (2) "***knowingly*** benefits financially or receives anything of value from any act that facilitates any activity described in paragraph (1)."[147]  Section 3012 imposes criminal liability upon a person who "***knowingly*** … subjects an individual to labor servitude or sexual servitude, except where the conduct is permissible under Federal or State law other than this chapter."[148]

Pennsylvania's criminal code defines levels of culpability.  "A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result."  "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."[149]

The legislative history of the Pennsylvania statute shows the civil remedy of section 3051 "authorizes victims to bring a private cause of action *against the person who subjected them to trafficking and involuntary servitude*. … Multiple victims may join suit against a single trafficker, and a single victim may join multiple persons who had a role in their victimization in the same suit.  Generally, there is a five-year statute of limitations. … Specific definitions relating to the sex trade are also included in this section."[150]

The Pennsylvania statute does not include "should have known" language.  The history of the statute contemplates an action against traffickers.  Unlike the federal Act, Pennsylvania's statute's civil remedy specifically does *not* create liability for "any person who provides goods or services to the general public" and cannot be civilly liable absent a showing of "knowingly markets or provides its goods or services" to a trafficker.  A.B. does not allege Marriott "knowingly provided" its services to her traffickers.

Under Pennsylvania law, "[w]hen engaging in statutory construction, a court's duty is to give effect to the legislature's intent and to give effect to all of a statute's provisions."[151]  We are directed "[t]he best indication of legislative intent is the plain language of the statute."[152]  We may not add words to a statute "which the legislature has omitted unless the phrase is necessary to the construction of the statute."[153]  We will not do so here, particularly where reading "should have known" language into the statute would alter the culpability standard.

A.B. fails to allege facts Marriott participated in human trafficking – which is defined by Pennsylvania statute as requiring knowing or reckless disregard.  She fails to allege facts Marriott's conduct falls within section 3051(a)(2) of Pennsylvania's human trafficking statute.

III.    **Conclusion**

We grant in part and deny in part Marriott's motion to dismiss.  We deny its objection to A.B.'s claim under section 1595 based on constructive knowledge and to A.B.'s allegations of an actual agency relationship.  We grant Marriott's motion to dismiss based on its objection it did not have actual knowledge of A.B.'s trafficking under section 1595 of the Act (as contrasted with sufficient allegations of constructive knowledge); an apparent agency relationship fails as a matter of law; and A.B.'s claim under Pennsylvania statute is time-barred and does not sufficiently plead Marriott "knowingly" marketed or provided its hotel rooms to A.B.'s trafficker.  A.B. may later move to amend with the benefit of more specificity adduced in discovery to cure these deficiencies in her amended complaint if she can do so consistent with this opinion and Rule 11.

---

[1] ECF Doc. No. 21 at ¶¶ 5-6, 81. We granted in part A.B.'s Motion for a protective order to proceed anonymously conditioned upon filing the Complaint under seal identifying her full correct name as well as the identity of a witness whose true name is altered in the original Complaint; service of our Order and sealed Complaint upon Marriott International; and the parties' discussion of possible multi-district litigation. *See* ECF Doc. No. 3. We ordered Marriott International shall not disclose or publish information identified solely in the sealed Complaint absent further order. *Id.*

[2] *Id.* at ¶¶ 81-83.

[3] *Id.* at ¶¶ 86-87, 93, 99.

[4] *Id.* at ¶¶ 34-36.  A.B. alleges traffickers use hotels as the hub of operations where victims are harbored and forced into service for buyers who come to the hotel to purchase sex, referred to as an "in call."  *Id.*  Traffickers also deliver victims to hotel rooms rented by buyers for sexual services, referred to as an "out call." *Id.*

[5] *Id.* at ¶¶ 87, 93, 99.

[6] *Id.*

[7] *Id.* at ¶¶ 88, 94, 99.

[8] *Id.* at ¶¶ 89, 95, 101.

[9] *Id.* at ¶¶ 90, 96, 102.

[10] *Id.* at ¶¶ 91-92, 97-98, 103-104.

[11] *Id.* at ¶ 105.

[12] *Id.* at ¶ 106.

[13] *Id.* at ¶¶ 106-107.

[14] *Id.* at ¶¶ 24-61.

[15] *Id.* at ¶ 24 n.4.  The Polaris Project is a non-profit organization committed to confronting and ending sex and labor trafficking in North American and operates the United States National Human Trafficking Hotline. *See* Polaris Project: About Us, polarisproject.org/about-us (last visited Apr. 13, 2020).

[16] ECF Doc. No. 21 at ¶ 25.

[17] *Id.* at ¶¶ 26-28.

[18] *Id.* at ¶ 30.

[19] *Id.* at ¶¶ 29-32.

[20] *Id.* at ¶¶ 39-42.

[21] *Id.* at ¶¶ 59-60.

[22] *Id.* at ¶ 62.  In response to Marriott's motion to dismiss, A.B. argues Marriott exercises day-to-day today control over its franchisees through franchise agreements.  A.B. cites a link to a Securities and Exchange Commission filing which, if followed, links to a 2006 Courtyard by Marriott Relicensing Franchise Agreement between Marriott International, Inc. and Apple Seven Services, L.P. in Brownsville, Texas.  A.B. does not explain how this franchise agreement has anything to do with her alleged trafficking.

[23] *Id.* at ¶ 65.

[24] *Id.*

[25] *Id.* at ¶¶ 66-68.

[26] *Id.* at ¶¶ 70, 76.

[27] *Id.* at ¶ 77.

[28] *Id.* at ¶ 73.

[29] *Id.* at ¶¶ 74, 78-79.

[30] *Id.* at ¶ 78.

[31] *Id.* at ¶ 79. If A.B.'s trafficking occurred at Philadelphia Airport hotels from 2009 to 2011, it is unclear how instances of trafficking in other hotels from 2012 to 2018 put Marriott on notice.

[32] *Id.* at ¶ 108.

[33] *Id.* at ¶¶ 109-112.

[34] *Id.* at ¶¶ 112-120.

[35] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1595 (the "Act").

[36] ECF Doc. No. 1.

[37] MDL 2928, ECF Doc. No. 1. The law firm representing A.B. filed the motion to centralize the proposed multidistrict litigation. The same firm, in addition to representing A.B., represents plaintiffs making similar claims against hotels under the Act in the Northeast and Mid-Atlantic: *Doe C.D. v. R-Roof Asset, LLC*, No. 19-11192 (D. Mass.); *V.G. v. G6 Hospitality, LLC*, No. 19-6071 (N.D.N.Y.); *H.G. v. Marriott International, Inc.*, No. 19-13622 (E.D. Mich.); *K.B. v. Inter-Continental Hotels Corp.*, No. 19-1213 (D.N.H.); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 19-1194 (S.D. Ohio); *A.D. v. Wyndham Hotels and Resorts, Inc.*, No. 19-120 (E.D. Va.).

[38] MDL 2928 at ECF Doc. No. 235, Schedule A.

[39] *Id.* at ECF Doc. No. 1.

[40] ECF Doc. No. 15.

[41] ECF Doc. No. 21.

[42] ECF Doc. No. 25.

[43] When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[w]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a

claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[44] *Twombly*, 550 U.S. at 570.

[45] *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[46] *Iqbal*, 556 U.S. at 678.

[47] ECF Doc. No. 26.

[48] Victims of Trafficking and Violence Protection Act of 2000, PL 106–386 (Division A), Oct. 28, 2000, 114 Stat 1464.

[49] Trafficking Victims Protection Reauthorization Act of 2003, PL 108–193, Dec. 19, 2003, 117 Stat 2875.

[50] *Id.*

[51] 18 U.S.C. § 1595.  Section 1589 imposes criminal liability for forced labor; section 1590 for trafficking with respect to peonage, slavery, involuntary servitude, or forced labor; and section 1591 for sex trafficking of children by force, fraud, or coercion.  *Id.* §§ 1589, 1590, 1591.

[52] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, PL 110–457, Dec. 23, 2008, 122 Stat 5044.

[53] *Id.*  Language stricken from bill appears with strike through; language added appears in underline.

[54] Chapter 77 of Title 18 of the United States Code pertains to "Peonage, Slavery, and Trafficking in Persons."

[55] Charles doyle, Cong. Research Serv., r40190, The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L.110-457): Criminal Law Provisions (2009) (emphasis added).

[56] Gallant Fish, *No Rest for the Wicked: Civil Liability Against Hotels in Cases of Sex Trafficking*, 23 Buff. Hum. Rts. L. Rev. 119, 138 (2011) (footnotes omitted).

[57] ECF Doc. No. 21 at ¶ 7.

[58] 18 U.S.C. § 1591(a).

---

[59] 18 U.S.C. § 1591(e)(4).

[60] 18 U.S.C. § 1595(a) (emphasis added).

[61] *M.A. v. Wyndham Hotels & Resorts, Inc.*, No. 19-849, 2019 WL 4929297 (S.D. Ohio Oct. 7, 2019)).

[62] *Id.* at * 3.

[63] ECF Doc. No. 27.

[64] *See Doe S.W. v. Lorain-Elyria Motel, Inc*., No. 19-1194, 2020 WL 1244192 (S.D. Ohio, Mar. 16, 2020); *H.H. v. G6 Hospitality, LLC*, No. 19-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019); *M.A.,* 2019 WL 4929297; *see also M.L. v. Craigslist, Inc.*, No. 19-6153 (W.D. Wash.) (report and recommendation from magistrate judge recommending denial of Wyndham's motion to dismiss).

[65] *See Doe 1 v. Red Roof Inns, Inc.*, No. 19-3840, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020); *Doe 2 v. Red Roof Inns, Inc.*, No. 19-3841, 2020 WL 1872337 (N.D. Ga. Apr. 13, 2020); *Doe 3 v. Red Roof Inns, Inc.*, No. 19-3843, 2020 WL 1872333 (N.D. Ga. Apr. 13, 2020); and *Doe 4 v. Red Roof Inns, Inc.*, No. 19-3845, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020).

[66] Motions to dismiss pending:  *H.M. v. Red Lion Hotels Corp.*, No. 19-4859 (N.D. Ga.); *H.G. v. Marriott International, Inc.*, No. 19-13622 (E.D. Mich.); *K.B. v. Inter-Continental Hotels Corp.*, No. 19-1213 (D.N.H.); *S.J. Choice Hotels Corp.*, No. 19-6071 (E.D.N.Y. – motion to dismiss expected May 1, 2020; *A.C. v. Red Roof Inns, Inc.*, No. 19-4965 (S.D. Ohio); *C.T. v. Red Roof Inns, Inc.*, No. 19-5384 (S.D. Ohio); *B. v. Hilton Worldwide Holdings, Inc.*, No. 19-1992 (D. Ore.); *A.D. v. Wyndham Hotels and Resorts, Inc.*, No. 19-120 (E.D. Va.).  Motion to dismiss denied without opinion with plaintiff voluntarily dismissing hotel: *L.W. v. Hilton Worldwide Holdings, Inc.*, No. 19-4171 (S.D. Tex.).  Answer, no motion to dismiss: *Doe C.D. v. R-Roof Asset, LLC*, No. 19-11192 (D.Mass.); *V.G. v. G6 Hospitality, LLC*, No. 19-6071 (N.D.N.Y.).

[67] *See Doe S.W.*, 2020 WL 1244192, at *6; *H.H.*, 2019 WL 6682152, at *3; *M.A.*, 2019 WL 4929297 at *6. There are six civil sex trafficking cases brought against hotels pending before Judge Marbley, the most of any of other federal district court addressed in the Judicial Panel's consideration of a multidistrict litigation.

[68] *M.A.*, 2019 WL 4929297, at *1. Judge Marbley's other two decisions; *H.H.* and *Doe S.W.* are substantially similar and apply the same analysis.

[69] *Id.* at *3.

[70] 853 F.3d 553 (1st Cir. 2017).

[71] *M.A.*, 2019 WL 4929297, at *4.

[72] No. 17-6404, 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018).

[73] *Id.* at *5.

[74] *Id.* at *5.

[75] *Id.* at *6.

[76] 632 F. App'x 272 (6th Cir. 2016).

[77] *Id.* at 274.

[78] *Id.* at 284-85.

[79] *Id.* at 286.

[80] *M.A.,* 2019 WL 4929297, at *7.

[81] *Id.* (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)); *see also Gilbert v. United States Olympic Committee,* 423 F. Supp. 3d 1112 (D.Colo. 2019) (cited by Judge Marbley). In *Gilbert*, female Olympic athletes sued the United States Olympic Committee and team coaches for forced labor and sex trafficking under, *inter alia*, section 1589 (forced labor provision). The court found *Afyare* "unpersuasive" as applicable to section 1591, and section 1589 "does not require a member of a venture to have committed overt acts in furtherance of obtaining forced labor or services in order for that member to be civilly liable to a plaintiff." *Id.* at 1138.

[82] *M.A.,* 2019 WL 4929297, at *8-9.

[83] *Id.* at *8.

[84] *Id.* at *9-10.

[85] *M.L. v. Craigslist, Inc.*, No. 19-6153 (W.D. Wash. Apr. 17, 2020), ECF Doc. No. 62, Report and Recommendation.

[86] *Id.* at 5-7.

[87] *Id.* at 11.

[88] *Id.* at 12-17.

[89] *See Doe 1 v. Red Roof Inns, Inc.*, No. 19-3840, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020); *Doe 2 v. Red Roof Inns, Inc.*, No. 19-3841, 2020 WL 1872337 (N.D. Ga. Apr. 13, 2020); *Doe 3 v. Red Roof Inns, Inc.*, No. 19-3843, 2020 WL 1872333 (N.D. Ga. Apr. 13, 2020); and *Doe 4 v. Red Roof Inns, Inc.*, No. 19-3845, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020).

[90] *Doe 1*, 2020 WL 1872335, at *3.

[91] *Id.* (citing 18 U.S.C. §§ 1595(a), 1591(a)(2), 1591(e)(4)).

[92] *Id.* (citing *Noble v. Weinstein*, 335 F.Supp.3d 504, 524 (S.D.N.Y. 2018); *Afyare*, 632 F.App'x at 286).

[93] *Noble v. Weinstein*, 335 F.Supp.3d 504 (S.D.N.Y. 2018).

[94] *Id.* at 523-24 (quoting *Afyare*, 632 F. App'x at 283).

[95] *Id.* at 524.

[96] *Id.*

[97] The Supreme Court reminds us it is a rule of construction in criminal statutes "wrongdoing must be conscious to be criminal." *Elonis v. United States*, 575 U.S. 723, 135 S.Ct. 2001, 2009 (2015) (quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952)). "The 'central thought' is that a defendant must be 'blameworthy in mind' before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like." *Id.* (quoting *Morissette*, at 252; 1 W. LaFave, Substantive Criminal Law § 5.1, pp. 332–333 (2d ed. 2003)). "Although there are exceptions, the 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'" *Id.* (quoting *United States v. Balint*, 258 U.S. 250, 251 (1922)). The Supreme Court generally "interpret[s] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Id.* (quoting *United States v. X–Citement Video, Inc*., 513 U.S. 64, 70 (1994)).

[98] *M.A.*, 2019 WL 4929297 at *7 (quoting *Peyton v. Rowe*, 391 U.S. 54, 65 (1968)) (citing *Noble*, 335 F.Supp.3d at 515).

[99] *Doe S.W.,* 2020 WL 1244192, at *5; *H.H*, 2019 WL 6682152, at *2; *M.A.*, 2019 WL 4929297, at * 3.

[100] ECF Doc. No. 21 at ¶¶ 80-107, 110, 112.

[101] ECF Doc. No. 25-1 at 9.

[102] *Canosa v. Ziff*, No. 18-4115, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019).

[103] *Id.* at *24.

[104] *Id.*

[105] ECF Doc. No. 21 at ¶¶ 80-107.

[106] *Id.* at ¶¶ 115-117, 124.

[107] *Doe S.W.*, 2020 WL 1244192, at *5 (citing *H.H.*, 2019 WL 6682152, at *2; *M.A.*, 2019 WL 4929297, at *3).

[108] 18 U.S.C. § 1591(a)(2) (emphasis added).

[109] *Noble v. Weinstein*, 335 F. Supp. 3d 504 (S.D.N.Y. 2018); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp.3d 156 (S.D.N.Y. 2019).

[110] *Geiss*, 383 F. Supp.3d at 169.

[111] *Id.* at 168.

[112] *Id.* at 168 n.3 (emphasis added).

[113] Judge Marbley relied on *Jean-Charles v. Perlitz*, 937 F.Supp.2d 276 (D. Conn. 2013) for support that participation in a venture under section 1595 should not import section 1591's definition. In *Jean-Charles*, plaintiffs brought claims alleging sexual abuse while students at a residential school for children in Haiti by the founder of the school. Plaintiffs brought claims under section 1595 against a priest, the Chaplain and Director of Campus Ministry at a university who served as Chairman and President of Haiti Fund's Board of Directors during the time the founder of the school sexually abused children. The court rejected defendants' argument the allegations of the complaint failed to support a plausible inference they knew or should have known of the abuse. The complaint alleged the priest knew at least one student lived in the founder's home, witnessed the founder showing at least one student a pornographic video, and stopped communications with a school administrator who confronted the director about sexual abuse. *Id.* at 288. These allegations  sufficiently raised a plausible inference the priest knew or should have known the residential school violated section 1591. *Id.* at 288-89. The court did not require the priest to have directly participated in the sex trafficking. Marriott distinguishes *Jean-Charles* arguing the alleged facts show direct, actual knowledge by the priest; allegations we do not have here. ECF Doc. No. 27, at 7 n.4. We already explained the allegations here at least plausibly infer Marriott's franchisee hotels should have known about her trafficking.

[114] *See Misko v. Speedway, LLC*, No. 16-13360, 2018 WL 2431638 (E.D. Mich. May 29, 2018); *Florida Abolitionist v. Backpage.com LLC*, No. 17-218, 2018 WL 1587477 (M.D. Fla. Mar. 31, 2018); *Ratha v. Phatthana Seafood Co., Lt.*, No. 16-4271, 2017 WL 8293172 (C.D. Cal. Dec. 21, 2017).

[115] *Florida Abolitionist*, 2018 WL 1587477.

[116] *Id.* at *5.

[117] ECF Doc. No. 21 at ¶¶ 80-107, 110, 112.

[118] We do not view A.B.'s amended complaint as a "shotgun pleading." A complaint failing to comply with Rule 8(a) is referred to as a "shotgun pleading." *Bartol v. Barrowclough*, 251 F.Supp.3d 855, 859 (E.D. Pa. 2017) (quoting *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792

F.3d 1313, 1320 (11th Cir. 2015)).  In *Bartol,* our colleague the Honorable Eduardo Robreno identified four categories of shotgun pleadings: "(1) 'a complaint containing multiple counts where each count adopts the allegations of all preceding counts'; (2) a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action'; (3) a complaint that does 'not separat[e] into a different count each cause of action or claim for relief'; and (4) a complaint that 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" *Id.* (quoting *Weiland*, 792 F.3d at 1321–23). "The 'unifying characteristic' of these four types of shotgun pleadings 'is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.'" *Id.* (quoting *Weiland*, 792 F.3d at 1323). Here, A.B.'s claims are directed to one defendant, Marriott.  Her allegations put Marriott on notice of the claims against it.

[119] ECF Doc. No. 21 at ¶¶ 76-77.

[120] *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A.2d 622, 625 (Pa. Super. 1993) (quoting *Gajkowski v. Int'l Bhd. of Teamsters*, 504 A.2d 840, 848 (Pa. Super. 1986)).

[121] *Id.* (quoting *Juarbe v. City of Phila.*, 431 A.2d 1073, 1076 (Pa. Super. 1981)).

[122] *Drexel v. Union Prescription Ctr.*, 582 F.2d 781, 785-86 (3d Cir. 1978).

[123] *Myszkowski*, 634 A.2d at 625-26 (quoting *Green v. Indep. Oil Co.*, 201 A.2d 207, 2010 (Pa. 1964)) (emphasis added).

[124] *Id.* at 626.

[125] *Id.* at 624.

[126] *Id.*

[127] *Id.* at 626-27.

[128] ECF Doc. No. 21 at ¶¶ 62-68.

[129] *Id.* at ¶¶ 62-68, 75-76 (emphasis supplied).

[130] ECF Doc. No. 25-1 at 16.

[131] RESTATEMENT (SECOND) OF AGENCY, § 267 (1958).

[132] *Myszkowski*, 634 A.2d at 629 (citing *Juarbe*, 431 A.2d at 1079).

[133] *Id.*

[134] *Id.* (citation and footnote omitted).

[135] *Id.* at 629-30 (emphasis in original).

[136] 18 Pa. Cons. Stat. Ann. § 3011.

[137] *Id.* § 3051(a).

[138] *Id.* § 3001.

[139] *Id.* § 3011.

[140] *Id.* § 3012.

[141] *Id.* § 3051(b).

[142] *Id.* § 3051(h)(1).

[143] ECF Doc. No. 21 at ¶ 54.

[144] *Id.* at ¶ 127.

[145] 18 Pa. Cons. Stat. Ann. § 3051(a)(1) (emphasis added).

[146] *Id.* § 3001.

[147] *Id.* § 3011 (emphasis added).

[148] *Id.* § 3012 (emphasis added).

[149] *Id.* § 302.

[150] JOINT STATE GOVERNMENT COMMISSION, GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA, LEGISLATIVE UPDATE, HUMAN TRAFFICKING IN PENNSYLVANIA: A REVIEW OF THE ACT OF July 2, 2014, P.L. 945, No.105, at 9.(Oct. 2014) (emphasis added).

[151] *Roverano v. John Crane, Inc*., No. 26 EAP 2018, No. 27 EAP 2018, 2020 WL 808186, at *7 (Pa. Feb. 19, 2020) (citing 1 Pa. Cons. Stat. § 1921(a)).

[152] *Id.* (citing *Matter of Private Sale of Prop. by Millcreek Twp. Sch. Dist*., 185 A.3d 282, 290-91 (Pa. 2018)).

[153] *Commonwealth v. Davis*, 799 A.2d 860, 869 (Pa. Super. 2002) (citing *Commonwealth v. Berryman*, 649 A.2d 961, 965 (1994) (*en banc*), *appeal denied*, 663 A.2d 685 (Pa. 1995)).