## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A.B.,<br><br>      Plaintiff,<br><br>  v.<br><br>MARRIOTT INTERNATIONAL, INC.,<br><br>      Defendant. | Civil Action No.: 19-cv-5770-MAK<br><br>Hon. Mark A. Kearney<br><br>**JURY TRIAL DEMANDED** |
| MARRIOTT INTERNATIONAL, INC.,<br><br>    Third-Party Plaintiff,<br><br>v.<br><br>COLUMBIA PROPERTIES PHILADELPHIA, LLC; COLUMBIA SUSSEX CORPORATION; W2005/FARGO HOTELS (POOL C) REALTY, LP; AIMBRIDGE HOSPITALITY, LLC; THARALDSON PROPERTY MANAGEMENT, INC.; JOHN DOE #1, JOHN DOE #2, and JOHN DOE #3.<br><br>    Third-Party Defendants. | |

## MARRIOTT INTERNATIONAL, INC.'S THIRD-PARTY COMPLAINT

Pursuant to Federal Rule of Civil Procedure 14(a), Defendant Marriott International, Inc. ("Marriot International"), by and through its undersigned counsel, files this Third-Party Complaint against Third-Party Defendants Columbia Properties Philadelphia, LLC; Columbia Sussex Corporation; W2005/Fargo Hotels (Pool C) Realty, LP; Aimbridge Hospitality, LLC; Tharaldson Property Management, Inc.; John Doe #1, John Doe #2, and John Doe #3, for contribution and/or

1

seeking indemnification with regard to Plaintiff A.B.'s claims.  In support, Marriott International alleges as follows:

1.      Marriott International files this Third-Party Complaint in connection with an action filed against it by Plaintiff A.B.—captioned *A.B. v. Marriott International, Inc.*, 19-5770 (E.D. Pa.).  On December 9, 2019, Plaintiff commenced this action against Marriott International by filing a complaint, and she filed the operative, First Amended Complaint on March 13, 2020.  (*See* Plaintiff's First Amended Complaint is attached as Exhibit A and the operative Scheduling Order for the litigation is attached as Exhibit B.)[1]  Plaintiff's allegations and Marriott International's answer to those allegations are incorporated by reference into this Third-Party Complaint.

## **PARTIES**

2.      Third-Party Plaintiff Marriott International is a worldwide operator, franchisor, and licensor of hotel, residential, and timeshare properties under numerous brand names at different price and service points.  Marriott International is incorporated in Delaware and its headquarters is in Bethesda, Maryland.

3.      Third-Party Defendant Columbia Sussex Corporation ("Columbia Sussex") managed the Renaissance Philadelphia Airport hotel, located at 500 Stevens Drive, Philadelphia, PA 19113, during the period of time in which Plaintiff alleges she was trafficked.  Columbia Sussex Corporation is a Kentucky Corporation with its principal place of business Crestview Hills, Kentucky.

---

[1] All public docket entries can be obtained online through Pacer, the federal court electronic docketing database. *See* https://ecf.paed.uscourts.gov/cgi-bin/login.pl (Docket No. 19-cv-5770). Plaintiff has been granted permission to proceed pseudonymously in this action.  Plaintiff is using only her initials, A.B., in public filings, and Marriott International is doing the same.  The Court ordered Plaintiff to disclose her name to Marriott International under seal, but precluded Marriott International from disclosing it absent further order.

4.      Third-Party Defendant Columbia Properties Philadelphia, LLC ("Columbia Properties") owned, franchised, and managed the Renaissance Philadelphia Airport hotel, located at 500 Stevens Drive, Philadelphia, PA 19113, during the period of time in which Plaintiff alleges she was trafficked.  Columbia Properties is a Delaware Limited Liability Company with a principal place of business in Crestview Hills, Kentucky.[2]

5.      Third-Party Defendant W2005/Fargo Hotels (Pool C) Realty, LP owned, franchised, and managed the Fairfield Inn, located at 8800 Bartram Avenue, Philadelphia, PA 19153, during the period of time in which Plaintiff alleges she was trafficked at the Philadelphia Airport hotels.  W2005/Fargo Hotels (Pool C) Realty, LP (hereinafter, "W2005") is a Delaware Limited Partnership and has its principal place of business in Plano, Texas.

6.      Third-Party Defendant Aimbridge Hospitality, LLC ("Aimbridge Hospitality") managed the Fairfield Inn, located at 8800 Bartram Avenue, Philadelphia, PA 19153, during the period of time in which Plaintiff alleges she was trafficked at the Philadelphia Airport hotels. Aimbridge Hospitality is a Delaware Limited Liability Company and has its principal place of business in Plano, Texas.

7.      Third-Party Defendant Tharaldson Property Management, Inc. ("Tharaldson") managed the Fairfield Inn, located at 8800 Bartram Avenue, Philadelphia, PA 19153, during the period of time in which Plaintiff alleges she was trafficked at the Philadelphia Airport hotels. Tharaldson is headquartered and incorporated in North Dakota.

---

[2] The Court has federal question jurisdiction over Plaintiff's claim and supplemental jurisdiction over this Third-Party Complaint, as set forth below.  Accordingly, the citizenship of the Third-Party Defendants does not affect this Court's jurisdiction over this Third-Party Complaint and need not be pleaded by Marriott International.

8.　　　Third-Party Defendants John Doe #1, John Doe #2, and John Doe #3 (collectively, "John Does #1-3") are Plaintiff A.B.'s traffickers.  Plaintiff alleges that she had more than one trafficker and that one of her traffickers operated with a "partner."  John Does #1-3 are each adult individuals.  Upon information and belief, John Doe #1 resides in New Jersey.  Although Plaintiff filed this action six months ago, that is the only information Marriott International has received to date about Plaintiff's traffickers.  Beyond that information, Plaintiff has refused to identify her sex traffickers or to provide any additional information about them out of fear for her safety.  Because Plaintiff is withholding this information, which she alone possesses, Marriott International is unable to plead the true names of John Does #1-3, their domiciles, and other pertinent facts about them.  Marriott International has nonetheless named them as "John Doe Defendants" to preserve its rights and ensure compliance with the Court's June 19, 2020 deadline for filing third-party complaints.

9.　　　The Third-Party Defendants are properly named under Federal Rule of Civil Procedure 14 because each Third-Party Defendant "may be liable" to Marriott International "for all or part of the claim" that Plaintiff A.B. is pursuing against Marriott International in this action. *See* Fed. R. Civ. P. 14(a)(1).

## JURISDICTION & VENUE

10.　　　This Court has subject-matter jurisdiction over Marriott International's Third-Party Complaint under 28 U.S.C. § 1367(a).  Marriott International's third-party claims are so related to Plaintiff A.B.'s federal claim against Marriott International that they form part of the same case or controversy within the meaning of Article III of the U.S. Constitution.

11.     Section 1367(b) does not divest this Court of supplemental jurisdiction because Plaintiff's claim arises under federal law and this Court has federal question jurisdiction over the underlying action pursuant to 28 U.S.C. § 1331.

12.     This Court should exercise supplemental jurisdiction over Marriott International's third-party claims because: (i) those claims do not raise novel or complex issues of state law; (ii) those claims do not substantially predominate over Plaintiff's federal claim; and (iii) no exceptional circumstances exist that would warrant declining to exercise jurisdiction.  28 U.S.C. § 1367(c).

13.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in the Eastern District of Pennsylvania.

14.     This Court has personal jurisdiction over the Third-Party Defendants because each has a substantial connection to Pennsylvania and has purposefully availed itself of the privileges and laws of the Commonwealth of Pennsylvania.

15.     Plaintiff's cause of action and Marriott International's Third-Party Complaint arise from Third-Party Defendants' conduct in the Commonwealth of Pennsylvania. As to the Third-Party Defendants W2005, Aimbridge Hospitality, Tharaldson, Columbia Sussex, and Columbia Properties, Plaintiff's claims and Marriott International's third-party claims arise from business activities that those Third-Party Defendants conducted in Pennsylvania, including the ownership, management, and operation of hotels located in Pennsylvania.  As to the Plaintiff's traffickers, Plaintiff's claims and Marriott International's third-party claims arise from John Does #1-3's tortious acts and omissions conducted in Pennsylvania, including the alleged trafficking of Plaintiff A.B. at hotels located in Philadelphia, Pennsylvania.

**PLAINTIFF'S COMPLAINT**

16.     The allegations in Plaintiff's First Amended Complaint (and Marriott International's answers thereto) are incorporated by reference, as if its averments were set forth at length herein, for purposes of setting out the background of the underlying action that gives rise to this Third-Party Complaint.

17.     In her First Amended Complaint, Plaintiff claims that "[b]etween the years of 2009-2011, A.B. was trafficked for days at a time at": (i) "the Fairfield Inn by Marriott – Philadelphia Airport located at 8800 Bartram Avenue," Philadelphia, PA; (ii) "the Renaissance Philadelphia Airport Hotel located at 500 Stevens Drive," Philadelphia, PA; and (iii) the Four Points by Sheraton – Philadelphia Airport located at 4101A Island Avenue," Philadelphia, PA. Ex. A ¶ 86. (These hotels are collectively referred to as the "Local Hotels.")

18.     Plaintiff's allegations about the trafficking she experienced at each of the Local Hotels are materially identical. *Id.* ¶¶ 81-107.

19.     Plaintiff alleges that John Does #1-3 "required [her] to have sex for payment with various buyers at" the Local Hotels "in response to advertisements for commercial sex that her various traffickers posted online." *Id.* ¶ 82.

20.     Plaintiff alleges that John Does #1-3 "compelled" and "forced" her "to perform commercial sex acts on as many as six men an evening." *Id.* ¶¶ 87, 93, 99. "Each man entered and exited the rooms at the" the Franchisee Hotels as "unannounced guest[s]." *Id.* At each hotel, "[t]here was a constant stream of male visitors to her room straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious." *Id.*

21.     Plaintiff alleges that John Does #1-3 (referred to by Plaintiff as "A.B.'s trafficker and his partner") "frequently paid for the rooms" at the Local Hotels "for at least a week at a time

with a prepaid credit card"—a process of payment John Does #1-3 repeated "regularly." *Id.* ¶¶ 88, 94, 100. Based on those payments, Plaintiff alleges "the hotel staff" at the Local Hotels "was aware that A.B. was there often." *Id.*

22.    Plaintiff alleges that she would go to the Local Hotels "with very limited personal belongings, and little if any luggage," and that John Does #1-3 "prohibited" her from "having a phone, wallet, or any form of identification." *Id.* ¶¶ 89, 95, 101.

23.    Plaintiff alleges that the rooms she "was kept in" at the Local Hotels "were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms." *Id.* ¶¶ 90, 96, 102.

24.    Plaintiff alleges that she exhibits "signs of visible injury" to the staff at the Local Hotels and that "there were frequently loud altercations" in her hotel rooms. *Id.* ¶¶ 91, 97, 103. Plaintiff alleges further that John Does #1-3 attacked her at the Local Hotels and that those attacks "were constant and loud enough for the hotel patrons and staff to hear." *Id.* ¶¶ 92, 98, 104.

25.    Based on the foregoing, Plaintiff seeks to hold Marriott International vicariously liable for the trafficking she experienced at the Local Hotels under the Trafficking Victims Protection Reauthorization Act ("TVPRA").[3]

26.    The Third-Party Defendants, not Marriott International, allegedly engaged in the above-summarized conduct giving rise to Plaintiff's TVPRA claim. Marriott International denies all liability.

27.    Plaintiff seeks damages as a result of her alleged criminal exploitation by John Does #1-3 who financially benefitted from her exploitation.

---

[3] Plaintiff also asserted state-law claim against Marriott International for violations of 18 Pa. Cons. Stat. § 3051, but the District Court dismissed that claim as inadequately pleaded. ECF No. 22.

28.     Plaintiff claims to have suffered "substantial physical and psychological injuries as the result of being trafficked and sexually exploited" by John Does #1-3 at the Local Hotels.  *Id.* ¶ 124.

29.     Marriott International moved to dismiss. The Court's ruling clarified that Plaintiff's claims seek to hold Marriott International vicariously liable for the alleged acts or omissions of the Third-Party Defendants. As the Court has held, Plaintiff has not stated a claim that Marriott International had "actual knowledge of A.B.'s trafficking under section 1595 of the Act" and Plaintiff's attempt to state a claim based on an apparent agency relationship also fails as a matter of law.  April 22, 2020 Memorandum, ECF No. 28, at 28.  Thus, the only remaining theory of liability on Plaintiff's claim is "based on constructive knowledge and [] A.B.'s allegations of an actual agency relationship."  *Id.*

## MARRIOTT INTERNATIONAL'S RELATIONSHIP WITH THE FRANCHISEE HOTELS

30.     W2005, Aimbridge Hospitality, and Tharaldson are obligated to indemnify Marriott International under common law and/or as a matter of contract because these entities franchised, owned, operated, and managed the Fairfield Inn Philadelphia Airport hotel. Collectively, W2005, Aimbridge Hospitality, and Tharaldson staffed and exercised day-to-day control over the management and operations of the Fairfield Inn Philadelphia Airport hotel.

31.     Columbia Properties and Columbia Sussex are obligated to indemnify Marriott International under common law and/or as a matter of contract because these entities franchised, owned, operated, and managed the Renaissance Philadelphia Airport hotel.  Collectively, Columbia Properties and Columbia Sussex staffed and exercised day-to-day control over the management and operations of the Renaissance Philadelphia Airport hotel.

32. Plaintiff A.B.'s claims are based on a fundamental misunderstanding of Marriott International's role as a franchisor of hotel properties.

33. Marriott International, as franchisor, does not own the franchised hotels. The franchisee and/or its hotel management company—*i.e.*, W2005, Aimbridge Hospitality, Tharaldson, Columbia Properties, and/or Columbia Sussex—are responsible for the management, staff, security, training and qualifications required of or provided to the hotel's employees as well as the methods and manner of daily operations at the hotels.

34. Marriott International lacked both actual and apparent authority to exercise day-to-day control over the management and operations of the Fairfield Inn Philadelphia Airport hotel and the Renaissance Philadelphia Airport hotel.

35. No agency relationship existed between Marriott International and W2005, Aimbridge Hospitality, Tharaldson, Columbia Properties, or Columbia Sussex.

**Fairfield Inn & Suites Philadelphia Airport**

36. At all times relevant to this action, W2005 owned, franchised, and managed the Fairfield Inn & Suites Philadelphia Airport hotel.

37. Aimbridge Hospitality was the hotel manager who operated the Fairfield Inn & Suites Philadelphia Airport hotel during a portion of the time Plaintiff alleges that she was trafficked at the hotel. Upon information and belief, W2005 entered into a management agreement with Aimbridge Hospitality.

38. Tharaldson was the hotel manager who operated the Fairfield Inn & Suites Philadelphia Airport hotel during a portion of the time Plaintiff alleges that she was trafficked at the hotel. Upon information and belief, W2005 entered into a management agreement with Tharaldson.

9

39.     W2005, Aimbridge Hospitality, and Tharaldson collectively and exclusively controlled all aspects of the management and day-to-day operations of the Fairfield Inn & Suites Philadelphia Airport hotel.

40.     During the years in which Plaintiff alleges she was trafficked at the Philadelphia airport hotels, the Fairfield Inn & Suites Philadelphia Airport hotel was franchised by W2005 pursuant to a Fairfield Inn Relicensing Franchise Agreement, dated March 31, 2006 (the "Fairfield Franchise Agreement").

41.     As the Fairfield Franchise Agreement makes clear, W2005 (not Marriott International) was the franchisee and "sole owner of the Hotel" during the period of time in which Plaintiff alleges she was trafficked at the hotel.  *See* Fairfield Franchise Agreement, § I.E.

42.     The Fairfield Franchise Agreement also provides that "Franchisee shall at all times be responsible for oversight of the Franchised Business."  *Id.* § V.A.

43.     The Fairfield Franchise Agreement states, "Nothing in this Agreement creates a fiduciary relationship between the parties hereto.  Franchisee is an independent contractor, ***and nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venture, partner, employee or servant of the other*** for any purpose whatsoever." *Id.* § XXI.A (emphasis added).

44.     The Fairfield Franchise Agreement states, "Franchisor does not exercise any direction or control over the employment policies or employment decisions of Franchisee.  All employees of Franchisee are solely employees of Franchisee, not Franchisor.  ***Franchisee is not Franchisor's agent for any purpose in regard to Franchisee's employees or otherwise***."  *Id.* § XXI.D (emphasis added).

10

45.     The Fairfield Franchise Agreement requires indemnification of Marriott International.  In particular, the Fairfield Franchise Agreement provides, "***Franchisee shall and hereby does indemnify and shall defend and save harmless Franchisor, its affiliates, their officers and employees, and their respective successors and assigns, from and against all losses, costs, liabilities, damages, claims, and expenses, of every kind and description***, including allegations of negligence by Franchisor, its employees and agents, to the fullest extent permitted by applicable law, and including reasonable attorneys' fees, arising out of or resulting from the renovating, upgrading, operation, alteration, remodeling, repair or use of the Franchised Business or the Hotel premises or of any other business conducted on or in connection with the Franchised Business by the Franchisee (or any management company operating the Hotel, or because of any act or omission of the Franchisee or anyone associated with, employed by, or affiliated with Franchisee (or any management company operating the hotel)." *Id.* § XXI.E (emphasis added).

46.     The Fairfield Franchise Agreement further provides that "[u]nder no circumstances shall Franchisor be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim under this indemnification and against Franchisee, and the failure of Franchisor to pursue such recovery or mitigate a loss will in no way reduce the amounts recoverable by Franchisor from Franchisee." *Id.*

47.     This indemnification requirement survives the termination of the Fairfield Franchise Agreement.

**The Renaissance Philadelphia Airport Hotel**

48.     At all times relevant to this action, Columbia Properties owned, franchised, and managed the Renaissance Philadelphia Airport hotel.

11

49.     At all times relevant to this action, Columbia Sussex was the hotel manager who operated the Renaissance Philadelphia Airport hotel. Upon information and belief, Columbia Properties entered into a management agreement with Columbia Sussex.

50.     Columbia Properties and Columbia Sussex collectively and exclusively controlled all aspects of the management and day-to-day operations of the Renaissance Philadelphia Airport hotel.

51.     During the years in which Plaintiff alleges she was trafficked at the Philadelphia airport hotels, the Renaissance Philadelphia Airport hotel was franchised by Columbia Properties.

52.     The Renaissance Hotel Philadelphia, Pennsylvania License Agreement, between Marriott International and CS Hotels Limited Partnership, dated January 10, 2000 (the "Renaissance License Agreement") was assigned to and assumed by Columbia Properties effective December 27, 2005.

53.     The Renaissance License Agreement makes clear that Columbia Properties was the franchisee and owner of the hotel during the period of time in which Plaintiff alleges she was trafficked at the hotel..

54.     The Renaissance License Agreement provides, "Except for the selection of the general manager, Licensor does not exercise any director or control over the employment policies or employment decisions of Licensee.  All employees of Licensee are solely employees of Licensee, not Licensor.  *Licensee is not Licensor's agent for any purpose in regard to Licensee's employees or otherwise.*"  Renaissance License Agreement, § 9.2(D).

55.     The Renaissance License Agreement further provides, "This Agreement does not create a fiduciary relationship between Licensor and Licensee.  Licensee is an independent contractor, and *nothing in this Agreement is intended to constitute either party an agent, legal*

12

*representative, subsidiary, joint venturer, partner, employee or servant of the other* for any purpose." *Id.* § 24.2.

56. The Renaissance License Agreement requires indemnification of Marriott International.

57. In particular, the Renaissance License Agreement provides that "*Licensee shall indemnify, defend and save harmless Licensor, its officers, agents and employees and its successors and assigns, from and against all Environmental Losses and other losses, costs, liabilities, damages, claims and expenses, of every kind and description*, including allegations of negligence by Licensor and its offices, employees, and agents, and including reasonable attorneys' fees, arising out of or resulting from the construction, operation or use of the Hotel or the Hotel premises or of any other business conducted on or in connection with the Hotel by the Licensee (or the Manager) or any Prospectus, or because of any act or omission of the Licensee or anyone associated with, employed by, or affiliated with the Licensee (or the Manager)." *Id.* § 16.1.

58. The Renaissance License Agreement further provides that "[u]nder no circumstances shall Licensor be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim under this indemnification and against Licensee, and the failure of Licensor to pursue such recovery or mitigate a loss will in no way reduce the amounts recoverable by Licensor from Licensee." *Id.* § 16.1.

59. This indemnification requirement survives the termination of the Renaissance License Agreement.

<u>**COUNT I**</u>
<u>**THIRD-PARTY CLAIM FOR CONTRIBUTION**</u>
<u>**Marriott International v. Third-Party Defendants**</u>

60. Marriott International incorporates by reference Paragraphs 1 through 59 as though the same were fully set forth herein at length.

61.     Pennsylvania law recognizes a right of contribution among joint tort-feasors.  42 Pa. Cons. Stat. § 8324(a).

62.     Third-Party Defendants are joint tort-feasors in the original action Plaintiff A.B. filed against Marriott International.  *See* 42 Pa. C.S. § 8322 (defining the term to mean "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them").

63.     Should Plaintiff prevail on her claim against Marriott International—and any liability on the part of Marriott International is specifically denied—any resulting damages were caused or substantially contributed to by the actions of the Third-Party Defendants, as more specifically set forth in the First Amended Complaint.

64.     The Third-Party Defendants are solely liable to Plaintiff, jointly and severally liable, or liable to Marriott International for all sums awarded to any party and against Marriott International, if any, at the trial of this matter.

65.     Should Plaintiff prevail on her claim against Marriott International—and any liability on the part of Marriott International is specifically denied—the Third-Party Defendants are liable to the Marriott International by way of contribution for all damages awarded to Plaintiff A.B., jointly and severally, together with costs, attorney's fees, and such other relief as the Court deems just and appropriate.

**COUNT II**
**THIRD-PARTY CLAIM FOR COMMON LAW INDEMNIFICATION**
**Marriott International v. Third-Party Defendants**

66.     Marriott International incorporates by reference Paragraphs 1 through 65, as though the same were fully set forth herein at length.

Case 2:19-cv-05770-MAK    Document 56    Filed 07/06/20    Page 15 of 62

67.    Marriott International has a preexisting legal relationship with the Third-Party Defendants involving the franchised hotels sufficient to give rise to a common law claim for indemnification.

68.    Plaintiff A.B.'s claim against Marriott International constitute tortious conduct that gives rise to common law indemnity.

69.    Plaintiff A.B. seeks to hold Marriott International vicariously or secondarily liable for the acts or omissions of the Third-Party Defendants.

70.    Third-Party Defendants are concurrent tort-feasors that owed a duty to Plaintiff A.B.

71.    Principals of equity warrant shifting to the Third-Party Defendants the entire responsibility for any damages awarded to Plaintiff against Marriott International.

72.    Should Plaintiff prevail on any of her claims against Marriott International—and any liability on the part of Marriott International is specifically denied—any resulting damages were caused or substantially contributed to by the actions of the Third-Party Defendants, as more specifically set forth in the First Amended Complaint.  Third-Party Defendants are solely liable to plaintiff, jointly and severally liable, or liable to Marriott International for all sums awarded to any party and against the Marriott International, if any, at the trial of this matter.

73.    Should plaintiff prevail on her claims against Marriott International—and any liability on the part of Marriott International is specifically denied—Third-Party Defendants are liable to Marriott International by way of indemnification for all damages awarded to Plaintiff A.B., jointly and severally, together with costs, attorney's fees, and such other relief as the Court deems just and appropriate.

15

**COUNT III**
**THIRD-PARTY CLAIM FOR CONTRACTUAL INDEMNIFICATION**
**Marriott International v. Columbia Properties and W2005**

74.    Marriott International incorporates by reference Paragraphs 1 through 73, as though the same were fully set forth herein at length.

75.    Pursuant to the terms of the Renaissance License Agreement, Columbia Properties is required to indemnify Marriott International for any recovery awarded to Plaintiff in this action.

76.    The Renaissance License Agreement provides that "***Licensee shall indemnify, defend and save harmless Licensor, its officers, agents and employees and its successors and assigns, from and against all Environmental Losses and other losses, costs, liabilities, damages, claims and expenses, of every kind and description***." Columbia Properties was the "Licensee" under this Agreement at all relevant times.

77.    Pursuant to the terms of the Fairfield License Agreement, W2005 is required to indemnify Marriott International for any recovery awarded to Plaintiff in this action. The Fairfield Franchise Agreement provides, "***Franchisee shall and hereby does indemnify and shall defend and save harmless Franchisor, its affiliates, their officers and employees, and their respective successors and assigns, from and against all losses, costs, liabilities, damages, claims, and expenses, of every kind and description***." *Id.* § XXI.E (emphasis added). W2005 was the "Franchisee" under this Agreement at all relevant times.

78.    Plaintiff A.B.'s claims against Marriott International trigger the above-quoted indemnification provisions of the Renaissance License Agreement and the Fairfield License Agreement.

79.    Should Plaintiff prevail on any of her claims against Marriott International —and any liability on the part of Marriott International is specifically denied—any resulting damages

were caused or substantially contributed to by the actions of the Columbia Properties and W2005, as more specifically set forth in the First Amended Complaint.  Columbia Properties and W2005 are solely liable to plaintiff, jointly and severally liable, or liable to Marriott International for all sums awarded to any party and against the Marriott International, if any, at the trial of this matter.

80.     Should plaintiff prevail on her claims against Marriott International—and any liability on the part of Marriott International is specifically denied—Columbia Properties and W2005are liable to Marriott International by way of indemnification for all damages awarded to Plaintiff A.B., jointly and severally, together with costs, attorney's fees, and such other relief as the Court deems just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Marriott International seeks judgment in its favor and against all Third-Party Defendants, including contribution and indemnity for all damages awarded to Plaintiff A.B., jointly and severally, together with costs, attorney's fees, and such other relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Marriott International demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Date:   June 19, 2020                              Respectfully submitted,

                                                   **DLA PIPER LLP**

                                                   By:  */s/ Courtney G. Saleski*
                                                   Courtney G. Saleski
                                                   Ben C. Fabens-Lassen
                                                   One Liberty Place
                                                   1650 Market Street, Suite 5000
                                                   Philadelphia, PA 19103
                                                   Phone:  215-656-2431

                                                   Michael P. O'Day (*pro hac vice*)
                                                   Ellen E. Dew (*pro hac vice*)
                                                   Michael Bakhama (*pro hac vice*)
                                                   The Marbury Building
                                                   6225 Smith Avenue
                                                   Baltimore, Maryland 21209

                                                   *Attorneys for Defendant*
                                                   *Marriott International, Inc.*

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A.B., an individual;<br><br>          Plaintiff<br><br>     -against-<br><br>MARRIOTT INTERNATIONAL, INC.;<br>Defendant. | CIVIL ACTION NO:2:19-CV-05770<br><br>HON. MARK A. KEARNEY<br><br>**PLAINTIFF'S FIRST AMENDED COMPLAINT AND JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff, A.B., by and through her undersigned counsel, and respectfully submits her first Amended Complaint and makes the following averments.

## INTRODUCTION

1. For years, sex trafficking ventures have openly operated in and out of Defendant Marriott's hotels as criminals have engaged in misconduct openly at said hotels throughout the United States. Marriott and its hotels remain willfully blind to the criminal misconduct to continued earning a profit from the trafficking of Plaintiff.

2. Defendant Marriott International, Inc. (hereinafter "Marriott" or "Defendant") knew, and should have known, for more than a decade that sex trafficking repeatedly occurs under its brand flag throughout the country.

3. Defendant Marriott failed to take timely and effective measures to thwart sex trafficking at its hotels. Marriott ignored the open and obvious presence of sex trafficking at its hotels and derived profit from rooms rented and used for this purpose.

4. This action for damages is brought by Plaintiff, (hereinafter identified by her initials "A.B."), a victim of sex trafficking under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA") and Pennsylvania law.

-1-

5. A.B. was first trafficked for commercial sex at the age of eighteen (18) years old.

6. A.B. met her first trafficker on an online dating website. After numerous conversations, A.B.'s trafficker took advantage of her naïveté and current needs, and convinced her to travel from Florida to New York to meet him, promising her a relationship and a place to stay. For years thereafter, A.B. was required by her traffickers to sexually service paying strangers while enduring brutal physical assaults, psychological torment, verbal abuse, and false imprisonment at Defendant's hotels.

7. Plaintiff now brings this action for damages against Marriott. Marriott, in violation of 18 U.S.C. § 1595, knowingly benefited from facilitating a venture that they knew, or at the very least should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

8. A.B. was kept against her will, physically tortured, and sexually exploited under such duress at various hotels in the Philadelphia area including the Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport Hotel located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Avenue.

9. As a direct and proximate result of Marriott's consistent refusal and/or failure to take adequate measures to prevent or not profit from human trafficking at its hotels, A.B. was trafficked, sexually exploited, and victimized repeatedly at the Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport Hotel located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Avenue.

10. Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against Defendants who enabled, harbored, held, facilitated, and

-2-

financially benefited from the sex trafficking venture in which she was trafficked for the purpose of commercial sex, systematically exploited, and brutally victimized in violation of 18 U.S.C. §1591 (a).

**PARTIES**

11. Plaintiff, having moved to proceed anonymously,[1] and, herein, identified by her initials A.B., was eighteen (18) years old when she was first sold for sex and trafficked throughout Philadelphia, Pennsylvania and Jacksonville, Florida. Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14). Plaintiff currently resides in Florida.

12. Defendant Marriott is one of the largest hotel companies in the world offering public lodging services directly or through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Bethesda, Maryland.

 a. Defendant Marriott International, Inc. is the successor entity to Starwood Hotels and Resorts Worldwide, Inc. and retains successor liability for the wrongful acts of the predecessor.

 b. As of 2016, Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts Worldwide, Inc. is a wholly owned subsidiary of Marriott International, Inc.

 c. Renaissance®, Four Points® by Sheraton, and Fairfield Inn® brand hotels are all Marriott hotels.

 d. As a hotel operator, Defendant Marriott controls the training and policies for its

---

[1] Contemporaneously with the Complaint [ECF No. 1], Plaintiff A.B. filed a Motion for Protective Order and Leave to Proceed Anonymously with Memorandum in Support [ECF No.2] based upon the nature of the allegations in the instant Complaint, which are of an inherently intimate and personal nature. That motion is pending. Undersigned Counsel will provide her identity to counsel for Defendant upon proper effectuation of service.

hotels including the Renaissance®, Four Points® by Sheraton, and Fairfield Inn® where A.B. was trafficked. Defendant Marriott represents that it considers guest safety and security important and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.[2]

e. Directly and through its relationship with the staff at the Renaissance®, Four Points® by Sheraton, and Fairfield Inn®, hotels where A.B. was trafficked and the hotel guest perpetrator who trafficked A.B. at Renaissance®, Four Points® by Sheraton, and Fairfield Inn® hotels, Defendant Marriott knowingly benefited, or received something of value from its facilitation of or participation in a venture which it knew or should have known engaged in sex trafficking.

f. Marriott receives a percentage of the gross room revenue from the money generated by the operations of Renaissance®, Four Points® by Sheraton, and Fairfield Inn® hotels, including a percentage of the rate charged on the rooms in which Plaintiff was sex trafficked.

g. Marriott owns, supervises, and/or operates The Fairfield Inn® by Marriott Philadelphia Airport located at 8800 Bartram Avenue; the Renaissance® Philadelphia Airport located at 500 Stevens Drive; and the Four Points® by Sheraton Philadelphia Airport located at 4101A Island Avenue in Philadelphia, Pennsylvania.

h. Marriott is subject to the jurisdiction of this Court because it regularly transacts business in Pennsylvania, operates dozens of hotels in Pennsylvania, contracts to

---

[2] Marriott International Inc., Human Rights Policy Statement (July 2017) available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

-4-

supply services in Pennsylvania, caused indivisible injuries to Plaintiff in Pennsylvania, and profited from an illegal sex trafficking venture at its hotels.

13. Whenever reference is made in this Complaint to any act, deed or conduct of Defendant, the allegation is that Defendant engaged in the act(s), deed(s), and/or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, and/or transaction of the ordinary business and affairs of Defendant.

## JURISDICTION AND VENUE

14. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 because this action arises under the Constitution, laws, or treaties of the United States (with an amount in controversy that exceeds $75,000.), based upon federal claims asserted pursuant to 18 U.S.C. § 1595.

15. This is a civil action alleging, *inter alia*, violations of 18 U.S.C. § 2421 and 18 U.S.C. § 1595

16. This Court has supplemental jurisdiction over A.B.'s state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so related to A.B.'s federal law claims that the claims form part of the same case or controversy.

17. Venue is proper within this District Court as this District Court is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(2), as well as the Pennsylvania Long-Arm statute.

18. Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

19. Defendants have consensually submitted to the jurisdiction Pennsylvania and have

purposefully availed themselves of the privilege of conducting acts in Pennsylvania through Marriott's dominion and control over its brand with franchisor subsidiaries, franchisee subsidiaries and operating hotels, and day-to-day operation of the hotels, and, thus, invoking the benefits and protections of the laws in Pennsylvania; Pennsylvania has an equally strong interest in protecting and assuring the safety of persons within its State.

20. Defendants have consensually submitted to the jurisdiction Pennsylvania and have purposefully availed themselves of the privilege of conducting acts in Pennsylvania which is imputed through the conduct of franchisor subsidiaries, franchisee subsidiaries and operating hotels as a result of Marriott's dominion and control over its brand, thus, invoking the benefits and protections of the laws in Pennsylvania; Pennsylvania has an equally strong interest in protecting and assuring the safety of persons within its State.

## SEX TRAFFICKING UNDER FEDERAL LAW

21. Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

22. While the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long-recognized and familiar atrocity.

23. Pursuant to 18 U.S.C. § 1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. This includes, at a minimum, both the 'traffickers' who recruit, harbor, transport, and provide

individuals for forced commercial sex work and the buyers who obtain, solicit, and/or patronize forced commercial sex work. Both the 'traffickers' and buyers therefore trafficked Plaintiff and paid for rooms from which Defendants profited.[3]

## FACTUAL ALLEGATIONS

## A. THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

24.     "75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation…Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff." The Polaris Project.[4]

25.     Reports by The Polaris Project were received and reviewed by the executives, directors and managers of Marriott.

26.     Upon information and belief, other publically available information regarding trafficking in hotels was received and reviewed by Defendant during the time period 2009 to 2014.

27.     Upon information and belief, between at least 2009 and 2014, Defendant held meetings among its executives, directors and managers at which sex trafficking in hotels was discussed.

28.     Upon information and belief, during at least the 2009 to 2014 time period, emails were exchanged by employees of Defendant that related to sex trafficking in hotels including Defendants' hotels.

29.     Defendant played a crucial role in the sex trade, as do all hotels.[5]

30.     Defendant permitted anonymity to the buyers and non-traceability, making them ideal

---

[3] While the 'pimps' or 'providers' are often referred to as the 'traffickers' and the purchasers are referenced as the 'Johns', 'tricks', or 'buyers' [and such nomenclature is used herein], under federal law **both** categories are 'traffickers'.

[4] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT, https://polarisproject.org/hotels-motels- recommendations (last visited June 19, 2019)

[5] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

venues for sex traffickers to sell Plaintiff for sex.

31.    Defendant knew or should have known that the anonymity for buyers and non-traceability of their presence at its hotels made their hotels ideal venues that were indeed used for sex trafficking.

32.    Defendant, prior to the information being known publically, knew or should have known, that hotels are the top-reported venue where sex trafficking acts occur.[6]

33.    Marriott knew or should have known that trafficking was taking place from at least 2009 – 2014 at the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport.

34.    Marriott knew that traffickers used its hotels, including the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport as hubs of operations. Inside, the victims, including Plaintiff, were harbored, raped, assaulted, and forced to service buyers who came to the hotel solely to purchase sex.

35.    Defendant knew or should have known that this is referred to as an "in call."

36.    Marriott knew or should have known that its hotels, including the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport, are also venues of choice for buyers seeking a so-called "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction.  Unsurprisingly, those on the demand side of this transaction (*i.e.* those purchasing sex) typically choose to engage in trafficking away from their

---

[6]    *National    Human    Trafficking    Hotline    Statistics*, THE    POLARIS    PROJECT    (2016), https://polarisproject.org/resources/2016-hotline statistics.

home, naturally leading to the increased involvement of hotels.

37.    At all relevant times herein,  Defendant knew or should have known that sex trafficking in hotels was industry wide, included its hotels, and that a significant portion of all sex trafficking was taking place at its hotels.[7]

38.    Due to the complacency of Defendant on addressing the issue, hotels are *the* venue of choice for sex trafficking.[8]

39.    From at least 2009-2014 and to date, traffickers and buyers used and use hotel rooms, including those rented by Defendant, due to Defendant's failure and/or refusal to adopt and enforce companywide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

40.    Upon information and belief, prior to 2014, and despite a duty to do so, Marriott took no measures to prevent sex trafficking at its hotels or profiting from sex trafficking at its hotels.

41.    Upon information and belief, prior to 2014, Marriott, through its employees, including executives, directors and managers, knowingly failed to take measures to prevent sex trafficking at its hotels or profiting from sex trafficking at its hotels, including the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport.

42.    Upon information and belief, Defendant, through its employees, including executives, directors and managers, decided not to take any measures to prevent sex trafficking at its hotels in order to conceal the fact that sex trafficking was occurring at its hotels.

---

[7] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[8] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

43. Upon information and belief, each year, from at least 2009 until 2014, Defendant received information indicating that sex trafficking had occurred at one of its hotels.

44. Upon information and belief, each year, from 2009 until 2014, Defendant received information from media reports and/or law enforcement indicating that sex trafficking had occurred at one of its hotels.

45. At all relevant times, Defendant had the financial resources to train hotel staff to identify the signs of sex trafficking.

46. At all relevant times, Marriott had the authority to require that training of hotel staff to identify the signs of sex trafficking take place including at the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport and to compel and ensure that such training take place.

47. From check-in to check-out, there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the implementation of reasonable security measures, Defendant could have prevented and identified regular sex trafficking under its respective flag.

48. Obvious signs of sex trafficking at Defendant's hotels included: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining room service for several consecutive days, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest

-10-

controlling another's identification documents.[9]

49.     Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[10] For this reason, hospitality companies, including Marriott, are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

50.     Hospitality companies, including Marriott, can and should mandate that *all* staff working at *all* hotel properties across their brands complete sex trafficking training.[11]

51.     In 2008, 18 U.S.C. § 1595 effectively required all companies with a peculiar proximity to human trafficking – including Marriott -- to use reasonable measures and conduct proactive audits to ensure that they were not profiting from what they *should know* are human trafficking ventures.

52.     The hospitality industry and Defendant have been cognizant of their role and responsibilities in the sex trafficking industry for years.

53.     In 2012, an anti-trafficking coalition alerted Choice Hotels, Accor, Best Western, Hilton, Hyatt, Intercontinental Hotels Group, Marriott, Starwood, and Wyndham of the likelihood of sex trafficking during the London Olympics, and inquired about the companies anti-trafficking policies, while urging immediate action regarding trafficking.[12]

---

[9] *Id. See also*, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[10] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[11] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[12] *Corporate Strategy to Address Human Trafficking: Investor Recommendations for London Olympic Sponsors and Hospitality Companies, Christian Brothers Investment Services*, CBIS, http://cbisonline.com/us/wp-content/uploads/sites/2/2012/09/FINAL_OlympicsReport_9_28.pdf (last visited June 19, 2019).

-11-

54.     Defendant Marriott knew, as of at least early 2006, that human trafficking was occurring in its hotels and across its brand.  Because of this, Defendant Marriott amended its Human Rights Policy as early as 2006 to require annual review of its policy. To date the policy merely states "Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention." [13]

55.     Further, nationwide campaigns, that Defendant was the target of and subject to, recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[14]  These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[15]

56.     The presence of sex trafficking and exploitation in hotels is an obvious occurrence and although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published for the hotel industry over the last decade to help hotel staff in every position to identify the signs.[16]

57.     Marriott has been aware of and monitored the anti-trafficking activities of the hospitality industry as a whole and that of specific competitors including those discussed above for years.

---

[13]  Our Commitment to Human Rights, MARRIOTT INTERNATIONAL INC. available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsCommitment.pdf (last visited Nov. 20, 2019) citing Marriott International, Inc.'s Human Rights Policy Statement available at https://www.marriott.com/Multimedia/PDF/Corporate/HumanRightsStatement.pdf (last visited Nov. 20, 2019).

[14]  DHS Blue Campaign Five Year Milestone, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

[15]  Human Trafficking and the Hospitality Industry, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[16]  DEPARTMENT OF HOMELAND SECURITY, Blue Campaign Toolkit, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue- campaign/toolkits/hospitality-toolkit-eng.pdf.

58.     For years, Marriott has participated in meetings and discussions with competitors and others in the hospitality industry about the prevalence of human trafficking in its hotels and the most effective means in which that trafficking could be stopped.

59.     Despite its knowledge of sex trafficking in its hotels and efforts undertaken or laid out by others to stop such trafficking, Marriott did nothing to stop the sex trafficking at its hotels.

60.     When Marriott eventually began to adopt policies and public statements to combat sex trafficking, it did so in appearance only.

61.     Hospitality companies, including Defendant, have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly fail to heed the call or repeatedly failed to execute their own policies. Instead, they continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

### B.     MARRIOTT CONTROLS THEIR LOCAL HOTELS

62.     Hotel brands or flags, including Defendant, lend their name and likeness to third party owners, while the building and operations are run by a franchisee or third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a contract or franchise agreement and still profits from putting heads in beds.

63.     The average consumer does not see this relationship.  The parent brand, including Defendant, gives the property its identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand.  The same brand is emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

64.     In addition to brand recognition, a marketing organization, hotel listings in the Global

-13-

Distribution System (GDS) and other online travel agency databases, the brand provides the local hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by Defendant.[17]

65. Upon information and belief, the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport pays around 10% of their total revenue back to Marriott and is required to develop and maintain the property in accordance with Marriott's brand standards as they are laid out in the franchise agreement.

66. Upon Information and belief, per the contract or franchise agreement, defendant Marriott may enforce these standards through periodic inspections and even termination of the agreement if the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, or the Four Points® by Sheraton – Philadelphia Airport is found to be inadequate. The right of Marriott, as the parent hotel brand, to enforce their brand standards is also its own responsibility.

67. At the time of the incidents alleged herein Marriott owned and controlled Renaissance®, Fairfield Inn® by Marriott, and Four Points® by Sheraton.[18]

68. Marriott could have kicked the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport out of its system as delinquent but it would have been done at the expense of terminating royalty payments so it was not done.

---

[17] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

[18] Starwood Hotels and Resorts, LLC f/k/a Starwood Hotels and Resorts, Inc. is now a wholly owned subsidiary of Marriott International Inc.

## C. MARRIOTT'S WILLFUL BLINDNESS TO SEX TRAFFICKING AT THEIR HOTELS

69. Defendant Marriott has been on notice of repeated incidences of sex trafficking occurring across their Renaissance®, Four Points®, and Fairfield Inn® hotels yet these brand managers failed to take the necessary and effective action to prevent sex trafficking and still persist in failing to take the necessary action to prevent se trafficking at their hotels.

70. Defendant Marriott controls, owns, supervises, or operates The Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Ave, in Philadelphia, Pennsylvania.

71. Marriott failed to implement and enforce any of their own policies and protect Plaintiff A.B. from being trafficked.

72. Founded in 1927, Marriott represents that they have more than Ninety-two (92) years of experience in managing successful brands. From all of their Renaissance®, Four Points®, and Fairfield Inn® hotels, Defendant Marriott receives an application fee, a lump sum payment, royalties, and other ongoing financial benefits.

73. Defendant Marriott knew or should have known that the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport where Plaintiff A.B. was trafficked for commercial sex were in areas known for a high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.B. was trafficked.

74. Despite having actual or constructive knowledge of the extensive prostitution and sex trafficking that occurs at hotels and specifically their hotels, Defendant Marriott has repeatedly

-15-

failed to thwart these activities.

75.     Defendant Marriott can exercise control over the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport:

    a.  distributing information to assist employees in identifying human trafficking;

    b.  providing a process for escalating human trafficking concerns within the organization;

    c.   requiring all employees to attend training related to human trafficking;

    d.  providing new hire orientation on human rights and corporate responsibility;

    e.  providing training and education to the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport through webinars, seminars, conferences, and online portals;

    f.  developing and holding ongoing training sessions on human trafficking;

    g.  conducting audits of training protocols; or

    h.  providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention.

76.     Defendant Marriott is/was in an agency relationship with Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport offering public lodging services. This agency relationship was created and is maintained through Defendant Marriott's exercise of an ongoing and systemic right of control over Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance®

-16-

Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport by Defendant Marriott's operations, including the means and methods of how Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport conduct daily business including:

    a.   hosting online bookings on Defendant Marriott's domain;

    b.   requiring Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport to use Defendant Marriott's customer rewards program;

    c.   setting parameters on employee wages;

    d.   making employment decisions;

    e.   advertising for employment;

    f.   sharing profits;

    g.   standardized training methods for employees;

    h.   building and maintaining the facility in a manner specified by Marriott;

    i.   standardized or strict rules of operation;

    j.   regular inspection of the facility and operation by Marriott;

    k.   fixing prices; or

    l.   other actions that deprive Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport of any independence in their business operations.

77.   An actual and/or apparent agency also exists between Defendant Marriott and the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport. Defendant Marriott holds out the

-17-

Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport as possessing authority to act on its behalf.

78. Given Defendant Marriott's public statements on behalf of its brand and the control it assumed in educating, implementing, and directing its hotels, Defendant Marriott breached its duties in the following ways:

    a. Failed (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

    b. Failed (altogether or adequately) to provide a process for escalating human trafficking concerns within the organization.

    c. Failed (altogether or adequately) to mandate managers, employees, or owners attend training related to human trafficking;

    d. Failed (altogether or adequately) to provide new hire orientation on human rights and corporate responsibility;

    e. Failed (altogether or adequately) to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f. Failed (altogether or adequately) to develop and hold or require ongoing training sessions on human trafficking; and/or

    g. Failed (altogether or adequately) to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

79. For years, Defendant Marriott has failed to address the rampant culture of sex trafficking which tragically occurs throughout its hotels across the country. This entrenched apathy to the

-18-

real risk of sex trafficking and pervasive willful blindness to the role its hotels play in sex trafficking, facilitated the sex trafficking of Plaintiff K.R. at the Fairfield Inn® by Marriott – Philadelphia Airport, the Renaissance® Philadelphia Airport Hotel, and the Four Points® by Sheraton – Philadelphia Airport that forms the basis for this complaint.

    a. In December of 2014, a man was charged with human trafficking after holding a woman and her toddler hostage at the Four Points® by Sheraton in San Rafael, California. The man held the woman in the hotel against her will and pimped her out while he watched her 2-year-old toddler.[19]

    b. In December of 2014, a traffic stop led to the discovery of a 16-year-old girl who was being sold for sex by a woman at a Four Points® by Sheraton in San Rafael, California.[20]

    c. In August of 2018, a survivor described to the San Francisco Chronicle how her sex trafficking experience started with her being trafficked out of a Four Points® by Sheraton in Emeryville, California. When she attempted to escape, she was re-captured by her pimp and thrown in the trunk of a car.[21]

    d. In February 2017, a Kansas woman was sentenced to nearly three years in federal prison for the sex trafficking of a teenage girl. The woman and her husband and co-trafficker had taken the girl to a Fairfield Inn® in Manhattan, Kansas for an out call.[22]

---

[19] "Hayward man arrested for alleged human trafficking in Marin Hotel," humhttps://www.times-standard.com/2014/12/08/hayward-man-arrested-for-alleged-human- trafficking-in-marin-hotel/
[20] "Police: Woman pimped 16-year-old girl at Marin hotel,"
https://www.chicoer.com/2014/12/24/police-woman-pimped-16-year-old-girl-at-marin-hotel/
[21] https://www.sfchronicle.com/crime/article/Sex-worker-s-murder-case-testimony-gives-rare-13192240.php
[22] http://www.kake.com/story/34426420/woman-sentenced-in-teen-sex-trafficking-case

-19-

e. In 2013, a 16 year old girl was taken by her trafficker, who was later convicted of his crimes, to a Fairfield Inn® in Dedham, Massachusetts where she was forced to engage in sex acts for his financial gain.[23]

f. According to crime statistics, from 2012-2017, Houston area Marriott hotels had among the highest number of arrests among hotel chains for commercial sex related crimes.[24]

## D. THE SEX TRAFFICKING OF A.B.

80. The facts alleged herein stem from multiple sex trafficking rings operating in Pennsylvania and across the country. While victimized by her traffickers in Pennsylvania, A.B. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at Defendant's hotels.

81. When A.B. was 18 years old and living in St. Augustine, Florida when she met her first trafficker on the internet. In January 2009, her trafficker lured her to New York under the guise of a romantic relationship when he took her to a hotel and violently raped her.

82. For years thereafter, A.B. was required to have sex for payment with various buyers at Defendant's hotels in response to advertisements for commercial sex that her various traffickers posted online.

83. A.B. was with her initial trafficker in New York for about 3-4 weeks when she was bought by another trafficker.

84. A.B.'s trafficker controlled her, punishing her with physical violence every time she did not conform to his abundant rules. A.B. was expected to meet quotas for her trafficker and would

---

[23]https://www.wickedlocal.com/x919096222/Dorchester-man-arrested-in-Quincy-pleads-guilty-    to-child-prostitution-charges

[24]https://www.chron.com/news/houston-texas/houston/article/Houston-s-most-popular-hotels-    for-prostitution-11744958.php

be punished by him regularly for failing to meet the quotas.

85. A.B.'s trafficker took her across state lines and would sell her out of hotels in states including Pennsylvania, New Jersey, and New York.

86. Between the years of 2009-2011, A.B. was trafficked for days at a time at the Fairfield Inn® by Marriott – Philadelphia Airport located at 8800 Bartram Avenue, the Renaissance® Philadelphia Airport Hotel located at 500 Stevens Drive, and the Four Points® by Sheraton – Philadelphia Airport located at 4101A Island Avenue in Philadelphia, Pennsylvania.

87. At the Fairfield Inn® by Marriott – Philadelphia Airport, A.B. was compelled by her trafficker to complete in-calls and service buyers. A.B. was forced to perform commercial sex acts on as many as six men an evening. Each man entered and exited the rooms at the Fairfield Inn® by Marriott – Philadelphia Airport as an unannounced guest. There was a constant stream of male visitors to her room straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious.

88. A.B.'s trafficker and his partner frequently paid for the rooms at the Fairfield Inn® by Marriott – Philadelphia Airport for at least a week at a time with a prepaid credit card. A.B.'s trafficker and his partner would repeat the process regularly. The rooms at the Fairfield Inn® by Marriott – Philadelphia Airport were always pre-paid and so the hotel staff was aware that A.B. was there often.

89. A.B.'s trafficker would bring her to the Fairfield Inn® by Marriott – Philadelphia Airport with very limited personal belongings, and little if any luggage. A.B. was also prohibited from having a phone, wallet, or any form of identification.

90. The rooms A.B. was kept in at the Fairfield Inn® by Marriott – Philadelphia Airport were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in

-21-

the rooms.

91.     To the staff at the Fairfield Inn® by Marriott – Philadelphia Airport, A.B. showed signs of visible injury on more than one occasion and there were frequently loud altercations.

92.     The attacks on A.B. by her traffickers at the Fairfield Inn® by Marriott – Philadelphia Airport were constant and loud enough for the hotel patrons and staff to hear.

93.     At the Renaissance® Philadelphia Airport Hotel, A.B. was compelled by her trafficker to complete in-calls and service buyers. A.B. was forced to perform commercial sex acts on as many as six men an evening. Each man entered and exited the rooms at the Renaissance® Philadelphia Airport Hotel as an unannounced guest. There was a constant stream of male visitors to A.B.'s room straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious.

94.     A.B.'s trafficker and his partner frequently paid for the rooms at Renaissance® Philadelphia Airport Hotel for at least a week at a time with a prepaid credit card. A.B.'s trafficker and his partner would repeat the process regularly. The rooms at the Renaissance® Philadelphia Airport Hotel were always pre-paid and so the hotel staff was aware that A.B. was there often.

95.     A.B.'s trafficker would bring her to the Renaissance® Philadelphia Airport Hotel with very limited personal belongings, and little if any luggage. A.B. was also prohibited from having a phone, wallet, or any form of identification.

96.     The rooms A.B. was kept in at the Renaissance® Philadelphia Airport Hotel were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms.

97.     To the staff at the Renaissance® Philadelphia Airport Hotel, A.B. showed signs of visible injury on more than one occasion and there were frequently loud altercations.

98.  The attacks on A.B. by her traffickers at the Renaissance® Philadelphia Airport Hotel were constant and loud enough for the hotel patrons and staff to hear.

99.  At the Four Points® by Sheraton – Philadelphia Airport, A.B. was compelled by her trafficker to complete in-calls and service buyers. A.B. was forced to perform commercial sex acts on as many as six men an evening. Each man entered and exited the rooms at the Four Points® by Sheraton – Philadelphia Airport as an unannounced guest. There was a constant stream of male visitors to A.B.'s room straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious.

100.  A.B.'s trafficker and his partner frequently paid for the rooms at Four Points® by Sheraton – Philadelphia Airport for at least a week at a time with a prepaid credit card. A.B.'s trafficker and his partner would repeat the process regularly. The rooms at the Four Points® by Sheraton – Philadelphia Airport were always pre-paid and so the hotel staff was aware that A.B. was there often.

101.  A.B.'s trafficker would bring her to the Four Points® by Sheraton – Philadelphia Airport with very limited personal belongings, and little if any luggage. A.B. was also prohibited from having a phone, wallet, or any form of identification.

102.  The rooms A.B. was kept in at the Four Points® by Sheraton – Philadelphia Airport were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms.

103.  To the staff at the Four Points® by Sheraton – Philadelphia Airport, A.B. showed signs of visible injury on more than one occasion and there were frequently loud altercations.

104.  The attacks on A.B. by her traffickers at the Four Points® by Sheraton – Philadelphia Airport were constant and loud enough for the hotel patrons and staff to hear.

-23-

105. A.B.'s trafficker continued to force her to service buyers for the next 5 years.

106. Prior to, during, and following the incidents described herein, Marriott had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at its hotels, including, but not limited to, video surveillance of their hotels, as well as oral or written complaints regarding said suspicious activity. Marriott failed to take any actions to curtail these activities.

107. Had Defendant been paying attention to the activities being conducted at its hotels, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

## E. MARRIOTT FACILITATED THE TRAFFICKING OF A.B.

108. Marriott profited from the sex trafficking of A.B. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. Marriott leased rooms to A.B.'s traffickers, when they knew, or should have known, that they were using the rooms to imprison A.B., physically assault her, and subject her to repeated exploitation as they forced her into sexual servitude.

109. Marriott knew, or should have known, that A.B. was being trafficked and that they were knowingly benefiting financially from said exploitation, because A.B.'s traffickers frequented Marriott's hotels.

110. Marriott knew, or should have known, that A.B. was being trafficked because A.B. constantly entertained traffic to appease her traffickers' demands, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using Marriott's hotels for his illegal sex trafficking venture.

111. Marriott actively participated in this illegal endeavor by knowingly or negligently providing

lodging to A.B.'s traffickers in which to harbor A.B. while they were trafficking her.

112. Marriott profited from the sex trafficking of A.B. and knowingly or negligently aided and participated with A.B.'s traffickers in their criminal venture. Marriott took no action as A.B. repeatedly visited its hotels, entertained numerous guests, without any luggage, avoiding all eye contact, and often displaying prominent bruising or injury all over her person.

113. Marriott actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from A.B. in which to harbor A.B. while she was being trafficked.

114. Marriott had the opportunity to stop A.B.'s traffickers and offenders like them from victimizing A.B. and others like her. Instead, Marriott failed to take reasonable measures to stop sex trafficking from occurring in its hotels.

115. Marriott financially benefited from the sex trafficking of A.B., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

116. Marriott enjoyed the steady stream of income that sex traffickers bring to its hotels.

117. Marriott benefits financially from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

118. Marriott failed to take steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation at their hotels.

119. Marriott maintained these deficiencies to maximize profits by:

    a. Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

c. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

120. As a direct and proximate result of these egregious practices on the part of Marriott, A.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

## COUNT ONE – 18 U.S.C §1595 ("TVPRA")

121. Plaintiff A.B. incorporates each foregoing allegation.

122. A.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

123. Marriott's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Marriott had a statutory obligation not to benefit financially from a venture that it knew, or should have known, was engaged in violations of 18 U.S.C. §1591 (a). At all relevant times, Marriott breached this duty by participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

124. Marriott financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade. Moreover, Marriott directly benefitted

-26-

from the trafficking of A.B. on each occasion it received payment for rooms that she was being kept in at Defendant's hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.B.'s injuries and damages A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Marriott's hotels in violation of 18 U.S.C. §1591 (a).

## COUNT TWO – 18 Pa. Cons. Stat. § 3051

125. Plaintiff A.B. incorporates each foregoing allegation.

126. A.B. is a victim of the sex trade within the meaning of 18 Pa. Cons. Stat. § 3051 and is therefore entitled to bring a civil action under 18 Pa. Cons. Stat. §3051.

127. Marriott's acts, omissions, and commissions, outlined above, constitute a violation of 18 Pa. Cons. Stat. §3051. Specifically, Marriott had a statutory obligation not to benefit financially from a venture that it knew was engaged in the sex trade. At all relevant times, Marriott breached this duty by knowingly participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by its acts, omissions, and commissions.

128. Marriott financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of its customer base that seeks to participate in the sex trade. Moreover, Marriott directly benefitted from the trafficking of A.B. on each occasion that they received payment for rooms that she was being kept in at Marriott hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.B.'s injuries and damages.

129. A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Marriott' hotels in violation of 18 U.S.C. §1591 (a).

-27-

**PRAYER FOR RELIEF**

WHEREFORE based on the forgoing, Plaintiff seeks injunctive relief in the form of judgement requiring the Marriott to institute sufficient audits, policies, rules, and requirements of their employees, agents, franchisees, contractors, and/or all others operating under their flag, logo, trademark, or advertising umbrella to insure that the actions and activities outlined above no longer occur and may not serve in the future to jeopardize the health and safety of individuals similarly situated to Plaintiff herein.

AND WHEREFORE on the basis of the foregoing, Plaintiff requests that a jury be selected to hear this case and render a verdict for Plaintiff, and against Defendant, and that the jury selected award damages to Plaintiff in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of Defendant's wrongs and injuries to Plaintiff due to Defendant's faulty conduct, including but not limited to:

a) All available compensatory damages for the described losses with respect to each cause of action;

b) past and future medical expenses, as well as the costs associated with past and future life care;

c) past and future lost wages and loss of earning capacity;

d) past and future emotional distress;

e) consequential and/or special damages;

f) all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g) punitive damages with respect to each cause of action;

h) reasonable and recoverable attorneys' fees;

-28-

i)  costs of this action; and

j)  pre-judgment and all other interest recoverable.

Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable in this civil action.

Dated: March 12, 2020

RESPECTFULLY SUBMITTED, PLAINTIFF,

By Her Attorneys,

Weitz & Luxenberg, P.C.
200 Lake Drive East
Suite No. 205
Cherry Hill, NJ 08002
Tel: (856) 755-1115
Fax: (856) 755-1995

# EXHIBIT A



## Who We Are

The Blue Campaign is the unified voice for the U.S. Department of Homeland Security's (DHS) efforts to combat human trafficking. Working with law enforcement, government, and non-governmental and private organizations, the Blue Campaign strives to protect the basic right of freedom and bring those who exploit human lives to justice.

## What's Inside?

This toolkit offers tips and resources that can help you inform and educate your employees about human trafficking.

It includes posters of human trafficking warning signs for four groups of employee:

- Hotel and Motel Staff
- Housekeeping, Maintenance and Room Staff
- Concierge, Bellman, Front Desk, Security and Valet Staff
- Food and Beverage Staff

These posters can be displayed in common areas of your business where employees congregate (such as staff break, laundry and maintenance rooms).

www.dhs.gov/bluecampaign

-31-


One Voice. One Mission. End Human Trafficking.

# What is Human Trafficking?

Human trafficking is modern-day slavery and involves the use of force, fraud or coercion to obtain labor or commercial sex. Every year, millions of men, women and children are trafficked in countries around the world, including the United States.

There are different types of human trafficking:

- Sex Trafficking
  Victims of sex trafficking are manipulated or forced to engage in sex acts for someone else's commercial gain. Sex trafficking is not prostitution.

  Anyone under the age of 18 engaging in commercial sex is considered to be a victim of human trafficking. No exceptions.

- Forced Labor
  Victims of forced labor are compelled to work for little or no pay, often manufacturing or growing the products we use and consume every day.

- Domestic Servitude
  Victims of domestic servitude are forced to work in isolation and are hidden in plain sight as nannies, housekeepers or domestic help.

## Human trafficking and the hospitality industry

Traffickers often take advantage of the privacy and anonymity offered by the hospitality industry. They can operate discreetly because staff and guests may not know the signs of human trafficking.

You may have employees who are victims of forced labor. If a third party applied for a position on behalf of an individual or if employees are not receiving their own paychecks, these could be signs of human trafficking.

Hotels and motels are also major locations where traffickers force sex trafficking victims to provide commercial sex to paying customers. Victims may be forced to stay at a hotel or motel where customers come to them, or they are required to go to rooms rented out by the customers.

## What actions can I take at my business to help stop human trafficking?

You play a significant role in helping to stop this terrible crime by:

- Knowing the signs of human trafficking.
- Designing a plan of action to respond to reports of human trafficking in your business.
- Partnering with agencies that provide services to victims of human trafficking. In the case of lodging, consider offering vouchers to victims. Immediate housing for victims plays a vital role in beginning a victim's healing process.
- Providing employee training to help them understand and identify signs of human trafficking.
- Distributing and posting the fact sheets in this kit to your employees.

Information on additional resources, literature, materials, and training offered by the Blue Campaign can be found at www.dhs.gov/bluecampaign.





# SIGNS OF HUMAN TRAFFICKING
## For **Hotel** and **Motel** Staff

Hotel and motel employees are often in the best position to see potential signs of human trafficking, especially since your duties give you access to different areas of the properties. You may also have direct or indirect contact with both traffickers and victims.

### GENERAL INDICATORS

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness.
- Individuals show signs of physical abuse, restraint, and/or confinement.
- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way.
- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior.
- Individuals lack freedom of movement or are constantly monitored.
- Individuals avoid eye contact and interaction with others.

- Individuals have no control over or possession of money or ID.
- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party.
- Individuals have few or no personal items—such as no luggage or other bags.
- Individuals appear to be with a significantly older "boyfriend" or in the company of older males.
- A group of girls appears to be traveling with an older female or male.
- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.

- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.

- Follow your corporate protocol, such as by notifying management and security.

- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.

- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign



**BLUE CAMPAIGN**
One Voice. One Mission. End Human Trafficking.®



# SIGNS OF HUMAN TRAFFICKING

### For **Housekeeping**, **Maintenance**, and **Room Service** Staff

Housekeeping, maintenance, and room service staff typically have the most access to guest rooms where signs of human trafficking may be apparent. By being conscious of human trafficking indicators, you can help identify possible human trafficking activities and victims.

## GENERAL INDICATORS

- "Do Not Disturb" sign used constantly.
- Requests room or housekeeping services (additional towels, new linens, etc.), but denies hotel/motel staff entry into room.
- Refusal of cleaning services for multiple days.
- Excessive amounts of cash in a room.
- Smell of bodily fluids and musk.
- Presence of multiple computers, cell phones, pagers, credit card swipes, or other technology.
- The same person reserving multiple rooms.
- Individuals leaving room infrequently, not at all, or at odd hours.
- Children's items or clothing are present but no child registered with the room.

- Individuals loitering in hallways or appearing to monitor the area.
- Excessive amounts of alcohol or illegal drugs in rooms.
- Evidence of pornography.
- Minors left alone in room for long periods of time.
- Excessive number of people staying in a room.
- Extended stay with few or no personal possessions.
- Provocative clothing and shoes.
- Constant flow of men into a room at all hours.
- Excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.).
- Rooms stocked with merchandise, luggage, mail packages, and purses/wallets with different names.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

-34-





For **Concierge, Bellman, Front Desk, Security,** and **Valet** Staff

Concierge, bellman, front desk, security, and valet staff are typically the first to see guests when they enter the hotel. When checking in or requesting hotel amenities, a guest may exhibit behavior indicating human trafficking.

## GENERAL INDICATORS

- Patrons checking into room appear distressed or injured.
- The same person reserving multiple rooms.
- Few or no personal items when checking in.
- Room paid for with cash or pre-loaded credit card.
- Excessive use of hotel computers for adult oriented or sexually explicit websites.
- Patrons not forthcoming about full names, home address or vehicle information when registering.
- Minor taking on adult roles or behaving older than actual age (paying bills, requesting services).
- Patron appears with a minor that he or she did not come with originally.
- Rentals of pornography when children are staying in the room.
- Individuals dropped off at the hotel or visit repeatedly over a period of time.

- Individuals leaving room infrequently, not at all, or at odd hours.
- Minor with a patron late night or during school hours (and not on vacation).
- Individuals checking into room have no identification.
- Room is rented hourly, less than a day, or for long-term stay that does not appear normal.
- Patrons request information or access to adult services or sex industry.
- Room rented has fewer beds than patrons.
- Individuals selling items to or begging from patrons or staff.
- Individuals enter/exit through the side or rear entrances, instead of the lobby.
- Car in parking lot regularly parked backward, so the license plate is not visible.

*Each indicator alone may not necessarily mean a person is being trafficked.*

## WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

-35-

-36-





# SIGNS OF HUMAN TRAFFICKING
## For **Food** and **Beverage** Staff

Food and beverage staff may have access to a guest's room or see them using the hotel restaurant or bar. Be conscious of these signs indicating a guest may be a victim of human trafficking.

### GENERAL INDICATORS

- Patron entertaining a minor at the bar or restaurant that he/she did not come in with originally.
- Patron claims to be an adult although appearance suggests he/she is a minor.
- Individuals loitering and soliciting male patrons.
- Individuals waiting at a table or bar and picked up by a male (trafficker or customer).
- Individuals asking staff or patrons for food or money.
- Individuals taking cash or receipts left on tables.

*Each indicator alone may not necessarily mean a person is being trafficked.*

### WHAT TO DO IF YOU SUSPECT HUMAN TRAFFICKING

- Do not at any time attempt to confront a suspected trafficker directly or alert a victim to your suspicions.
- Call 9-1-1 for emergency situations—threats of violence, physical assault, emergency medical needs, etc.
- Follow your corporate protocol, such as by notifying management and security.
- Call 1-866-DHS-2-ICE (1-866-347-2423) to report suspicious criminal activity to federal law enforcement. Highly trained specialists take reports from both the public and law enforcement agencies. Submit a tip at www.ice.gov/tips.
- To get help from the National Human Trafficking Resource Center (NHTRC), call 1-888-373-7888 or text HELP or INFO to BeFree (233733).

www.dhs.gov/bluecampaign

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **A.B.** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO. 19-5770** |
| | **:** | |
| **MARRIOTT INTERNATIONAL, INC.** | **:** | |

## <u>ORDER</u>

**AND NOW,** this 11th day of May 2020, following our April 22, 2020 Order (ECF Doc.

No. 30) beginning discovery and today's telephonic Initial Pretrial Conference, it is **ORDERED**:

1.      Counsel and parties are required to follow this Court's Policies and Procedures in

effect at the time of the anticipated action ("Policies") and Default Order on Electronic Discovery

found at www.paed.uscourts.gov.

2.      Plaintiff shall file the fulsome stipulated facts required under our April 22, 2020

Order no later than **May 15, 2020.**

3.      We **strike** Affirmative Defenses in No. 5 and waiver, acquiescence, estoppel in No.

15 (ECF Doc. No. 33) without prejudice.

4.      We **strike** Defendant's demand for attorney's fees from Plaintiff without prejudice.

5.      All motions to further amend the pleadings and to join or add additional parties

shall be filed by **June 19, 2020.**   As Defendant already notified one possible set of additional

parties, we urge the parties to promptly evaluate potential additional parties mindful of our

discovery and trial schedule and delay in adding parties will not constitute good cause to modify

this Order.

6.      The parties declined a Fed.R.Evid. 502(d) Order without prejudice.

7.      All fact and expert discovery shall be served, noticed and completed by **September 25, 2020**[1] and until further Order:

        a.      We expect written discovery to be promptly completed and deposition discovery should be, to the extent necessary, done through a video-sharing service, including allowing a Court Reporter to also participate by video-sharing arranged by the party noticing the deposition;

        b.      We encourage counsel and parties to be particularly civil to each other in scheduling and completing depositions;

        c.      Counsel are excused from providing courtesy copies of electronic filings;

        d.      We may not be able to be contacted during the deposition but questioning should not end based on an objection which we cannot immediately resolve;

8.      No later than **May 12, 2020**, all parties seeking relief of any sort shall serve a detailed written demand, attaching all key documents in support of their demand, only upon all parties claimed to be responsible for any claim of relief.  All responding parties shall provide a detailed written response on or before **June 15, 2020**.

9.      **This matter is referred to Magistrate Judge Heffley for all settlement purposes.**  Plaintiff's Counsel will immediately contact Magistrate Judge Heffley to schedule an

---

[1]We previewed a trial beginning on November 2, 2020 during today's conference.  As shown below, we moved this trial date to December 8, 2020 as trial counsel did not identify a conflict then.  We made this change after counsel raised fair questions not included in their Rule 26 report regarding adding parties over the next month.  We are also aware delayed criminal trials in our District may otherwise require we defer a November trial date for a short period.  Further mindful of the effect of COVID-19 protocols and state and local orders, we provide the parties over 150 days of discovery.  But should *all* parties wish to extend this *discovery* deadline *without extending any other deadline*, the parties may agree to do so without seeking leave of Court.

initial settlement conference to occur on or before **September 30, 2020**. Counsel will timely advise Magistrate Judge Heffley if there is <u>no chance</u> of settlement before the conference.

10. Counsel for each party shall serve upon counsel for every other party the information referred to in Federal Rule of Civil Procedure 26(a)(2)(B) necessary to meet their burden of proof by expert report or answer to expert interrogatory no later than **August 28, 2020**. If the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party, counsel shall serve such rebuttal evidence on counsel for every other party no later than **September 21, 2020**. Expert depositions, if any, shall be concluded no later than **September 25, 2020**.

11. Any party expecting to offer opinion testimony from lay witnesses under Fed. R. Evid. 701, shall, at the time required for submission of information and/or reports for expert witnesses set forth in the preceding paragraph, serve opposing parties with concise details and/or documents detailing the lay opinions of the Rule 701 witnesses, including the identity of each witness, the substance and the basis for each opinion.

12. Summary judgment and *Daubert* motions, if any, shall be filed no later than **October 5, 2020**. Responses shall be filed in accord with the Local Rules and this Court's Policies and no later than **October 19, 2020**. Motions for summary judgment and responses shall fully comply with this Court's Policies, including:

(a) A separately filed Statement of Undisputed Material Facts which details, in numbered paragraphs, the material <u>facts</u> that the moving party contends are undisputed and entitle the movant to judgment as a matter of law. Only those facts which bear on dispositive material issues shall be included in the Statement of Undisputed Facts.

3

(b)     Opposition to a motion for summary judgment shall include a separate filing of a Statement of Material Facts, responding to the numbered paragraphs in the movant's Statement of Undisputed Facts, which the respondent contends present genuine issues for trial. The responding party also shall set forth, in separate numbered paragraphs, any additional facts which the respondent contends preclude summary judgment.

(c)     Statements of Material Facts in support of or in opposition to a motion for summary judgment shall include specific and not general references to the record that support each of the statements. Each stated fact shall cite the source relied upon, including the page of any document or line and page number of any deposition to which reference is made.

(d)     Memoranda in support of, or opposing, a Rule 56 motion is limited to twenty-five (25) pages, double-spaced, twelve (12) point font.

(e)     Upon filing, the movant(s) shall also file a separate appendix of all exhibits or affidavits which may relate to the issues raised in the motion. On all cross-motions under Rule 56, the cross-movants must consult and file a joint appendix. All pages of the appendix shall be consecutively "Bates stamped" and referenced by the Bates number assigned to each page. The appendix shall include a table of contents. The movant shall make every effort to include all necessary exhibits in the appendix, anticipating the respondent's necessary citations to the fullest good faith extent possible. Should it become necessary for the non-moving party to submit affidavits or additional exhibits, it may do so in a respondent's appendix filed with its Opposition. Any additions to the movant's appendix shall also be consecutively Bates-stamped, beginning sequentially at the page number where the movant's appendix ended, and shall include a table of contents. This Court will not consider party documents not included in the appendix.

(f)     Parties shall provide Chambers with one (1) paper courtesy copy of all filed summary judgment submissions by overnight mail or hand delivery within one (1) business day of filing.

(g)     Failure of the movant to follow this procedure in all respects may result in denial of the motion without prejudice to be renewed at trial.  Respondent's failure to comply in all respects may result in this Court's considering the motion as uncontested.

13.     Only those exhibits, discovery items and expert witnesses identified in the manner set forth in this Order shall be considered for admission into evidence at trial, unless stipulated by all affected parties and approved by the Court.

14.     The unavailability of a witness will not be a ground to delay the commencement or progress of an ongoing trial.  If a witness may be unavailable at the time of trial in the manner defined in Fed. R. Civ. P. 32(a)(4), testimony must be presented by oral or videotape deposition at trial.

15.     No later than **November 9, 2020**, counsel for each party shall exchange a list identifying each exhibit the party expects to offer at trial along with a reference to the Bates number or other identification of the documents used in discovery.

16.     No later than **November 10, 2020**, each party shall file a pretrial memorandum compliant with our Policies.

17.     No later than **November 11, 2020**, each party shall file proposed jury instructions on substantive issues and proposed verdict forms or special interrogatories, with an electronic copy e-mailed in Word format to Chambers_of_Judge_Kearney@paed.uscourts.gov.

18.     All motions affecting trial presentations (e.g., *in limine* or bifurcation), proposed *voir dire* peculiar to your case, objections to proposed jury instructions, list of contested exhibits

5

and deposition designations (providing the contested exhibits and highlighted designations to Chambers) shall be filed on or before **November 13, 2020**. Responses, including highlighted counter-designations and objections, if any, shall be filed on or before **November 20, 2020**.

19.     A final pretrial conference will be held telephonically on **December 4, 2020** at **8:30 A.M.** Counsel for Plaintiff shall initiate this call and timely call Chambers at 267-299-7680 when all counsel are on the line.

20.     Counsel is attached for jury selection followed by a seven-day trial beginning on **December 8, 2020** at **9:00 A.M.** in Courtroom 6-B.

21.     We urge counsel to be respectful of the impact COVID-19 is having upon every person at this early stage of this case, including opposing counsel, the parties, process servers, Court Reporters, and the Court. We will strive to do the same.

_____

**KEARNEY, J.**

6